### In re AIRCRAFT CRASH LITIGATION FREDERICK, MARYLAND, MAY 6, 1981.

#### No. C–3–82–195.

United States District Court, S.D. Ohio, W.D.

Aug. 21, 1990.

---

Marc S. Moller, Kreindler & Kreindler, New York City, Joseph M. Juergens, Springfield, Ohio, Robert Farquhar, Arthur Ames, Carmine Garofalo, Thomas A. Hansen, Dayton, Ohio, John J. Kennelly, Chicago, Ill., Robert A. Marcis, Craig Spangenberg, Spangenberg, Shilbey, Traci & Lancione, Cleveland, Ohio, Thomas M. Green, Green & Green, Richard G. Snell, Jeffrey, Snell, Rogers & Greenberg, Dayton, Ohio, William R. Coen, Kettering, Ohio, George B. Herndon, Jr., Fayetteville, N.C., for plaintiffs.

David C. Greer, Howard Krisher, Bieser, Greer & Landis, Dayton, Ohio, Richard C. Coyle, Perkins Coie, Seattle, Wash., for defendant Boeing Co.

Craig D. Andrew, James M. Wiles, Wiles, Doucher, Van Buren, Boyle & Casey, Columbus, Ohio, Neil F. Freund, Freund, Freeze & Arnold, Dayton, Ohio, for defendant Lear Siegler, Inc.

Herbert L. Lyons, Sr. Aviation Counsel, Dept. of Justice, Torts Branch, Civ. Div., Major Derrence Fivehouse, Aviation/Admiralty Law Section, Washington, D.C., Patrick Quinn, Asst. U.S. Atty., Dayton, Ohio, for defendant U.S.

RICE, District Judge.

DECISION AND ENTRY SUSTAINING MOTIONS FOR SUMMARY JUDGMENT FILED IN CONSOLIDATED CASE; MOTION FOR SUMMARY JUDGMENT OF DEFENDANT BOEING (DOC. # 150) SUSTAINED; RENEWED MOTION FOR SUMMARY JUDGMENT OF DEFENDANT McDONNELL DOUGLAS (DOC. # 215) SUSTAINED; RENEWED MOTION FOR SUMMARY JUDGMENT OF DEFENDANT LEAR (DOC. # 217) SUSTAINED; JUDGMENT TO BE ENTERED IN FAVOR OF MOVING DEFENDANTS AND AGAINST PLAINTIFFS IN CONSOLIDATED CASE AND IN ALL CASES CONSOLIDATED THEREIN (*Darling v. The Boeing Co., et al.*, C–3–82–195; *Hodge v. The Boeing Co. et al.*,–C–3–82–196; *Wetzel v. The Boeing Co., et al.*, C–3–82–197; *Resides v. The Boeing Co., et al.*, C–3–82–198; *Frederick v. The Boeing Co., et al.*, C–3–82–199; *Middleton v. The Boeing Company, et al.*, C–3–82–200; *Harris v. The Boeing Company et al.*, C–3–82–201; *Bayliss v. The Boeing Company, et al.*, C–3–82–202; *Ross v. The Boeing Company, et al.*, C–3–82–206; *Presley v. The Boeing Company, et al.*, C–3–82–208; *Fonke v. The Boeing Company, et al.*, C–3–82–365; (in behalf of David Fonke estate); *Masters v. The Boeing Co., et al.*, C–3–82–785; *Juergens v. The Boeing Company, et al.*, C–3–83–407; *Bernhold v. Boeing Co., et al.*, C–3–82–204; *Riley v. Boeing Co., et al.*, C–3–82–211; *Fonke v. Boeing Co., et al.*, C–3–82–366, (on behalf Linda Fonke estate); FOLLOWING ENTRY OF JUDGMENT, CASES C–3–82–204, C–3–82–211, AND C–3–82–366 ARE TO BE SEVERED FROM THE OTHER 13 CASES; TRIAL UPON THE MERITS OF THE SEVERED CASES REMAINS SET FOR FEBRUARY 19, 1991; FINAL JUDGMENT TO BE ENTERED IN CASE NOS. C–3–82–195; C–3–82–196; C–3–82–197; C–3–82–198; C–3–82–199; C–3–82–200; C–3–82–201; C–3–82–202; C–3–82–206; C–3–82–208; C–3–82–365; C–3–82–785; AND C–3–83–407

These consolidated cases are the result of a true catastrophe—the crash of an Air Force EC–135N jet aircraft, and the loss of all on board, on May 6, 1981. The Plaintiffs, who are the personal representatives of certain military and civilian decedents, have filed suit on alternative theories of strict liability, breach of express and implied warranty and negligence in connection with the design and testing process for the aircraft, and seek damages from the Boeing Company ("Boeing"), which designed and manufactured the aircraft pursuant to an Air Force contract, Lear Siegler, Inc. ("Lear"), which, also pursuant to an Air Force contract, designed and manufactured the aircraft's autopilot system, and McDonnell Douglas Corporation ("MDC"), which modified the aircraft under an Air Force contract some six years after its original construction.[1] The United States is also a Defendant in three cases filed by the representatives of civilian decedents (Case Nos. C–3–82–204, C–3–82–211, and C–3–82–366).

This case is currently before the Court on Boeing's Motion for Summary Judgment (Doc. # 150) and the renewed Memorandum of Law in support thereof (Doc. # 221) ("Boeing Memorandum"), on MDC's Renewed Motion for Summary Judgment and Memorandum in support thereof (Doc. # 215) ("MDC Memorandum"), and on Lear's Renewed Motion for Summary Judgment and Omnibus Memorandum in Support thereof ("Lear Memorandum") (Doc. # 217). All three Defendants have invoked the government contractor defense set forth in *Boyle v. United Technologies Corp,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), as grounds for their respective motions.[2]

## I. BACKGROUND

### A. *The Accident*

On May 6, 1981, at 10:05 a.m., an Air Force EC–135N aircraft departed Wright Patterson Air Force Base, Dayton, Ohio, on a round-trip training flight scheduled to last approximately five hours. On board were a crew of seventeen, and four autho-

---

1. In the course of their twenty-page list of liability contentions, Plaintiffs have also asserted that each Defendant negligently *manufactured* the particular system and/or components for which it was responsible. Doc. # 31 *passim.* Plaintiffs have not come forward, by way of Fed.R.Civ.P. 56 materials, with any specific facts indicative of such negligent manufacture of the accident aircraft and/or its components, by any of these Defendants.

2. As additional grounds for its Motion, Lear asserts that Plaintiffs' claims against it are barred by Section 707 of the Defense Production Act of 1950, 50 U.S.C.App. § 2157 (Supp.1990). Doc. # 217 at 68–71. Although Boeing asserted the same defense in its original memorandum in support of its Motion, Doc. # 151 at 80–85, it has not raised the Defense Production Act as a bar to Plaintiffs' claims either in its renewed memorandum, Doc. # 221, or in its Reply, Doc. # 226.

Lear's contract with the Air Force was drafted pursuant to the Defense Production Act. W.D. Brown Affidavit at ¶ 8. It was a "rated" contract, which required its priority over other Lear contracts. The Act subjected contractors to criminal penalties for failure to perform any act required under their contracts with the government. 50 U.S.C.App. § 2073. Lear argues that Section 707 of the Act should be construed to

provide a complete bar to tort claims against manufacturers having such "rated" contracts. Doc. # 217 at 70. Section 707 provided, in pertinent part:

No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act … notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid….

50 U.S.C.App. § 2157.

The classic situation in which Section 707 applies is where a manufacturer who is party to a contract under the Act is sued by a third party whose contract with the manufacturer has been adversely affected by the contract's defense rating. *In re Agent Orange Product Liability Litigation,* 597 F.Supp. 740, 844 (E.D.N.Y.1984). This Court has found no case holding that Section 707 immunity extends to third parties' tort claims. The legislative history does not affirmatively support such a conclusion. *Id.* at 844–45. One Court has stated in *dicta* that Section 707 immunity, if it applies at all in tort cases, would apply only to strict liability claims. *In re Agent Orange,* 597 F.Supp. at 845. In view of the manner in which this Court has resolved Lear's Motion for Summary judgment, it declines to reach Lear's argument under the Defense Production Act.

rized observers, including two wives of crewmembers participating in the Air Force Systems Command's Have Partner spouse orientation program. The pilot in command was Captain Joseph C. Emilio. No stressful or unusual training requirements were planned for the flight. Air Force Systems Command Press Briefing, June 12, 1981, Plaintiffs' Exhibit # 2.

The aircraft was cruising eastward near Walkersville, Maryland, at approximately 29,000 feet when, at 10:49 a.m. (some 45 minutes into the flight) Federal Aviation Administration air traffic control lost radar contact with it. No distress calls or emergency transmissions were received from the aircraft, which crashed at approximately 10:51 a.m. There were no survivors. USAF Aircraft Accident Investigation IAW AFR 110–14, Plaintiffs' Exhibit # 1 [hereinafter AF Investigation Report].

At the time of the crash the left pilot seat was occupied by Mrs. Peggy Emilio, one of the participants in the Have Partner spouse program, and the right pilot seat was occupied by Captain Emilio. Two navigators and two passengers were also in the crew compartment. The locations of other persons in the aircraft could not be determined. *Id.* Examination of the wreckage resulted in the recovery of the actuator which controlled the stabilizer trim, the moveable leading edge of the horizontal portion of the aircraft's tail which, in conjunction with the elevators located at the trailing edge of the horizontal tail section, controls the aircraft's "pitch," or nose-up/nose down position. The position in which the actuator was found corresponded to the full aircraft nose-down position. *Id.* at Tab 2.5; Boeing Memorandum at 8. The cockpit pitch trim indicator and the horizontal stabilizer trim jackscrew were also recovered from the wreckage, and each was found to indicate full nose-

down trim. AF Investigation Report, at Tab. 3.2.1.[3]

The position of the aircraft's horizontal stabilizer can be adjusted in three ways. It can be controlled electrically, by means of an AC motor, which is in turn controlled by identical switches located on each pilot's control wheel. *Id.* It can also be controlled manually, by means of a pitch trim wheel. *Id.* In the EC–135N this wheel is located on the left side of the aisle console placed between the two pilot's seats. Boeing Memorandum, Doc. # 221, at 10 and Appendix 1. Use of the trim wheel is a "laborious" process requiring the pilot to turn the wheel thirty-five full revolutions to retrieve the trim from full nose down to zero. AF Investigation Report at Tab 3.2.-1. It is undisputed that the horizontal stabilizer can also be controlled by an autopilot such as the one with which the aircraft in this case was equipped.

The Air Force's analysis of possible causes of the crash led it to conclude that

[f]or undetermined reasons, the aircraft pitch trim moved to the full nose down position. The aircraft then rapidly pitched over, most likely upon release of the auto-pilot, and induced sufficient negative "G" forces to cause [its AC] generators to trip off line, resulting in the loss of all AC electrical power. The pitch trim could not then be moved electrically. This condition, while unusual, can be controlled [manually, by use of the trim wheel] if prompt corrective action is taken; however, if corrective action is delayed approximately 8 seconds, the aircraft pitch angle will be greater than 30 degrees nose-down and the airspeed in excess of 350 knots indicated airspeed. Under these conditions, the aircraft cannot be controlled until the pitch trim is moved toward neutral.[4] While it is evident that recovery was delayed, the reason for the delay is unknown. The air-

---

**3.** The Air Force Aircraft Accident Investigation indicates that the position of the jackscrew and the accuracy of the cockpit pitch trim indicator would not have been affected by impact forces associated with the crash. *Id.*

**4.** The difficulty of this maneuver is demonstrated by Air Force simulator runs, which resulted

in the conclusion that "[w]hen recovery was delayed beyond 8 seconds and until the aircraft was 30 degrees nose-down with airspeed greater than 350 Knots Indicated Airspeed (KIAS), recovery was impossible." AF Investigation Report at Tab 3.2.5.2 (footnote by the Court).

craft became uncontrollable and entered a steep descent. During the rapid descent, an explosion occurred at approximately 1300 feet above ground level followed immediately by catastrophic failure, and complete break-up of the aircraft.

AF Investigation Report at "Synopsis" and Tab 3.3. It is not disputed that rapid pitch-over of the aircraft could and did result in loss of AC electrical power so that the pitch trim could not be corrected electrically. It is also not disputed that after approximately eight seconds of full nose-down pitch, the aircraft pitch angle and airspeed would be such as to make manual recovery of the aircraft impossible.

### B. *The Parties' Contentions Concerning the Accident's Cause*

The parties to the instant Motions differ markedly in their theories of the cause of the aircraft's pitch-over and succeeding events leading to loss of the airplane. Plaintiffs contend that the aircraft's sudden pitch-over was the result of a "flight control system malfunction," most probably in the autopilot. Plaintiffs' "Omnibus" Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment [hereinafter Plaintiffs' Memorandum], Doc. # 219, at 3–5. They claim that the aircraft's automatic flight control system was designed to be capable on its own (i.e., without a command from the flight crew) of moving the pitch trim to the full nose down position while the autopilot is in altitude hold mode. Plaintiffs' Liability Contentions, Doc. # 31 at ¶ 1. They contend that the flight control system was defective in that the autopilot was "failure prone" and because "single point failures in the system [that] caused uncommanded trim inputs which threatened the safe operation of the plane were commonplace." Plaintiffs' Memorandum at 12. Plaintiffs contend that the design of the aircraft's autopilot was defective in several respects, *id.* at 12–14 (quoting Plaintiffs' Responses to Liability Discovery Requests, Doc. # 144 at 35–38).[5]

5. Plaintiffs' expert, Dr. Richard C. Lathrop, opined that the accident was caused by one or more of the alleged defects to which Plaintiffs refer in their Responses to Liability Discovery Requests (Doc. # 144). Dr. Lathrop's statement, which quotes verbatim the relevant excerpts from Plaintiffs' contentions, is unaccompanied by an expert's report. Plaintiffs contend that the autopilot was defectively designed in that it

a. it can cause spontaneous uncommanded trim changes that are dangerous and adversely affect airplane safety;

b. the autopilot by design can fail in such manner as to cause the aircraft to experience .2g's or less resulting in electrical failure and violent pitch down. The autopilot can also be rendered inoperative as a result of an electrical failure in normal flight if the aircraft briefly experiences .2g's for 2 or 3 seconds or less;

c. the autopilot can fail in such manner as to cause full or close to full nose down trim during flight conditions which do not require that trim setting;

d. the autopilot failure can trigger a violent pitchover while the autopilot is in altitude hold mode during routine cruise phases of flight;

e. the autopilot failure can cause the aircraft to enter regimes of flight where it will lose aileron control and spoiler effectiveness and encounter Mach tuck;

f. the autopilot can fail and force the flight crew to rely on a dangerous and inadequate backup mechanical trim system;

g. the autopilot has the capacity to mask out almost full horizontal stabilizer nose down trim thus creating an unsafe condition and potential emergency without warning to crew member [sic];

h. the elevator servo clutches can slip while the autopilot is engaged in the altitude hold mode and precipitate a sudden pitch down;

i. failures of the trim coupler and control amplifier can precipitate nose-down trim conditions during regimes of flight that do not require that setting thus creating an unsafe condition;

j. the autopilot did not have an effective stopping mechanism, loading sensing device and/or redundancy to prevent a mistrim or nose-down runaway trim condition;

k. the autopilot pitch axis does not fail passively;

l. no elevator channel and pitch trim failure monitoring was provided to 135 aircraft flight crew members;

m. no warning systems were provided to bring to a flight crew's attention the fact the autopilot was malfunctioning and/or in a dangerous out-of-trim condition;

n. the MC–1 autopilot was comprised of too many individual components such that by reason of the excessive interconnections of numerous components the potential for electrical malfunctions within the system was maximized;

o. the MC–1 autopilot and its components were not assigned a meaningful service life, and

Plaintiffs allege that the aircraft was defectively designed such that the combination of unanticipated trim malfunction leading to full nose-down attitude and complete loss of electrical power [as a result of the aircraft's AC generators' characteristic of tripping off a few seconds following the sustained negative gravity or "G" forces attendant upon a dive such as that experienced by the aircraft in this case] led to a "failure mode" from which a reasonably qualified pilot such as Captain Emilio could not recover the aircraft. Plaintiffs' Memorandum at 16.[6] They also contend that the location of the single manual trim wheel (by means of which the pitch trim might have been corrected after loss of electrical power) was a design defect, in that "[t]he aircraft could not be operated in a flight control systems emergency as safely from the right [pilot's] seat as from the left [pilot's] seat when a full range of motion of the mechanical trim wheel was necessary." *Id.* at 15. Plaintiffs further contend that the aircraft was defectively designed in that (1) it lacked visual and/or aural warning systems to alert the crew that the pitch trim was in motion or in an abnormal position for a given phase of flight; (2) its flight manuals did not disclose how quickly the aircraft would could become unrecoverable after entering the full nose-down trim position; (3) the aircraft was inherently defective because it was unrecoverable once eight seconds had elapsed following a flight control system malfunction; (4) it

lacked devices to prevent trim malfunctions and/or warnings of those malfunctions' impending occurrence. *Id.* at 16–17.

Defendants contend that the aircraft's pitch-over was caused when Mrs. Emilio, seated in the left pilot's seat, inadvertently activated the trim stabilizer switch located on the left pilot's control wheel, and that the failure to correct the pitch-over in the time period before the situation became irremediable was due to human error attributable to Captain Emilio. Boeing Memorandum, Doc. # 221, at 8; Lear Memorandum, Doc. # 217, at 14; MDC Memorandum, Doc. # 215, at 23. Nevertheless, Defendants assume, *per arguendo*, that Plaintiffs' contentions are correct, for purposes of their Motions for Summary Judgment. Boeing Memorandum, Doc. # 221 at 10; Lear Memorandum, Doc. # 217 at 19. MDC Memorandum, Doc. # 215 at 29.

## II. THE GOVERNMENT CONTRACTOR DEFENSE

### A. *Boyle v. United Technologies Corp.*

█ As noted above, Boeing, Lear and MDC argue that they are entitled to absolute immunity under *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The Court now turns to a discussion of the elements of the *Boyle* defense.

---

could fail suddenly, unpredictably and without warning;

p. by reason of its design the MC–1 autopilot becomes progressively unreliable, unsafe and logistically unsupportable [sic];

q. by reason of its design and the frequency of failure of individual components and replacements of the autopilot system maximized [sic] the potential for errors in the course of maintenance and repair of the system and replacement of component parts, errors which could weaken the integrity and functional capability of the system.

(1) Lathrop Affidavit, Doc. # 159, Exhibit 15 at ¶ 6 (quoting Doc. # 144, at 35–38).

**6.** The reason that all electrical power is lost when the aircraft enters zero or negative gravity conditions, as when the aircraft experiences a pitch over, is as follows. Each of the aircraft's AC electrical generators receives its rotational

energy from the aircraft engine with which it is associated by means of a constant speed drive ("CSD"), which is a hydraulic device. Affidavit of Dudley K. Myers, Boeing's engineer responsible for the KC–135A's CSD specifications ("Myers Affidavit"), at ¶¶ 2–3. In zero or negative gravity, the CSD's hydraulic oil is dispersed into air in the CSD, and does not circulate properly within the system. If this results in insufficient oil for proper CSD operation, the associated generator trips off. *Id.* at ¶ 3. The geometry of the oil tank determines how long the AC generators will function in zero or negative gravity *Id.* at ¶ 5. Plaintiffs' precise contention regarding the CSD's is that they were designed to cause the AC generators to trip off once the aircraft has experienced zero or negative gravity for two seconds, a period of time which Plaintiffs contend is defectively brief. Doc. # 144 at 32.

In *Boyle*, a United States Marine helicopter pilot was killed when his helicopter crashed off the coast of Virginia during a training mission. 487 U.S. at 502, 108 S.Ct. at 2513. The pilot survived the impact, but he drowned when he was unable to open the escape hatch, which had been designed pursuant to a government contract to open outward, thereby rendering it ineffective against water pressure once the helicopter was submerged. *Id.* at 502–03, 108 S.Ct. at 2513. The pilot's father sued the helicopter's manufacturer, Sikorsky Division of United Technologies Corporation ("Sikorsky"), alleging that Sikorsky had defectively repaired the component of the helicopter's automatic flight control system that allegedly caused the crash and alleging that Sikorsky had defectively designed the emergency escape hatch. *Id.* at 503, 108 S.Ct. at 2513. Plaintiff had argued that state tort law imposed a duty upon Sikorsky to design the escape hatch to open inward and to position the escape hatch handle so that access to it would not be obstructed by other equipment. *Id; see also Boyle v. United Technologies Corp.*, 792 F.2d 413, 414 (4th Cir.1986). Following a general verdict for the Plaintiff, the district court denied Sikorsky's motion for a judgment notwithstanding the verdict. *Boyle*, 487 U.S. at 503, 108 S.Ct. at 2513.

The Fourth Circuit reversed and remanded, directing that judgment be entered for Sikorsky. It held, as a matter of federal common law, that Sikorsky could not be held liable for the alleged defect in the design of the escape hatch, because it had satisfied the elements of the military contractor defense, as set forth in *Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir.1986).[7] On appeal, the United States Supreme Court considered the question whether there was a basis in federal law for immunizing government contractors from liability under state tort law for design defects in military equipment, and the question whether the Fourth Circuit's formulation of the defense was appropriate. *Boyle v. United Technologies Corporation*, 487 U.S. 500, 503, 108 S.Ct. 2510, 2513, 101 L.Ed.2d 442 (1988). The Court held that the government contractor defense does exist as a matter of federal common law.[8] The basis for such a defense, the Court reasoned, lies in the "discretionary function" exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), which protects the United States from liability for its agents' performance of duties involving discretionary decisions. *Id.* at 511–13, 108 S.Ct. at 2517–19. In the absence of the defense, the Court reasoned, the government's own immunity in tort for its actions taken pursuant to its discretionary functions would be undermined. Contractors held liable for design features which had been approved pursuant to an exercise of governmental discretion would inevitably pass the costs of liability on to the government, thereby imposing costs on the government which the FTCA was enacted to prevent. *Id.* at 512, 108 S.Ct. at 2518.

Under *Boyle*, state tort law is displaced where the liability it would impose touches upon an area that is of "uniquely federal interest." *Id.* at 504–07, 108 S.Ct. at 2514. The procurement of military equipment, the *Boyle* Court held, is an interest that is "uniquely federal." *Id.* at 507, 108 S.Ct. at 2515. A second condition to the displacement of state law under *Boyle* is that there exist a "significant conflict" between the area of uniquely federal concern and the operation of state law. *Id.* The *Boyle*

---

7. The Fourth Circuit also held that the Plaintiff had failed to demonstrate that repairs done by Sikorsky, and not those done by the Navy, had caused the malfunction in the automatic flight control system, and ordered that judgment be entered for Sikorsky on the defective repair claim. *Id.* (citing 792 F.2d at 414–15).

8. In its opinion, the Court of Appeals had stated that "[b]ecause Sikorsky has satisfied the requirements of the military contractor defense, it can incur no liability for . . . the allegedly defec-

tive design of the escape hatch." *Id.* at 514, 108 S.Ct. at 2519 (quoting 792 F.2d at 415). Petitioner argued before the Supreme Court that the Fourth Circuit had conducted its own evaluation of the facts. Suggesting that the Court of Appeals had merely held that no reasonable jury could have found for the petitioner on the facts presented, the Court nevertheless vacated the Fourth Circuit's judgment and remanded for the purpose of clarification of the basis of its decision. *Id.*

Court provided three scenarios to illustrate the parameters of this "conflict" requirement. Where, for example, the duty imposed by state law is contrary to the duty imposed by the government contract, the requisite significant conflict exists. *Id.* at 509, 108 S.Ct. at 2516. This was true in *Boyle* itself, where the design of the escape hatch mechanism, which Plaintiff asserted was defective under state law, was mandated by specifications in the government contract. *Id.* Where, however, the government merely orders a particular piece of equipment from stock, the requisite conflict does not exist, the Supreme Court reasoned, because it cannot be said that the federal government has a significant or unique interest in the design features of that piece of equipment. *Id.* Similarly, state tort law requiring a particular safety feature is not preempted where a government contract for a piece of equipment specifies a particular *operational* characteristic but does not mandate "the precise manner of *construction*" and therefore does not preclude the inclusion of that safety feature. *Id.* (emphasis added).

The *Boyle* Court held that the FTCA "suggests the outlines of" its "significant conflict" requirement. *Id.* at 511, 108 S.Ct. at 2517. That Act provides a private cause of action for damages, stemming from the negligent or wrongful conduct of federal employees, that is coextensive with a private person's liability under state law, 28 U.S.C. § 1346(b), except where the claim is "based upon [the federal employee's or agency's] exercise or performance or ... failure to exercise or perform a discretionary function or duty...." 487 U.S. at 511, 108 S.Ct. at 2517 (quoting 28 U.S.C. § 2680(a)). The Court went on to state

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [the FTCA's "discretionary function" exception]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the

trade-off between greater safety and greater combat effectiveness.

*Id.* at 511, 108 S.Ct. at 2517.

In setting forth the scope of the defense it enunciated, the Court adopted the elements of the defense employed by the Fourth Circuit in *Tozer* and by the Ninth Circuit in *McKay v. Rockwell International Corporation,* 704 F.2d 444, 449 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175. *See* 487 U.S. at 512–13, 108 S.Ct. at 2518–19. According to *Boyle,* "liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512, 108 S.Ct. at 2518.

The *Boyle* Court intended both that the immunity provided by the defense it enunciated be broad and that active participation of the contractor in the design process not be preclusive of that defense. This is clear from the Court's stated reasons for its formulation of the elements of the defense:

> The first [two elements] assure that the suit is within the area where the policy of the "discretionary function" would be frustrated—i.e., *they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself.* The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.

487 U.S. at 512–13, 108 S.Ct. at 2518 (emphasis added). The Court rejected an alternative formulation of the elements of the

defense that would have provided immunity only if the contractor did not participate in, or only minimally participated in, the design process or if the contractor, in effect, warned the government of all design defects. *Id.* (citing *Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 746 (1985).

In this Court's view, *Boyle* means that the defense applies where the "discretionary function" exception to the FTCA would prevent liability on the part of the federal government in the area of military procurement. Thus, where the government exercises its discretion with regard to the design of a particular piece of equipment (instead of simply ordering it from stock), discretion expressed through "engineering analysis" and the exercise of judgment regarding technical and military factors, and trade-offs between safety and mission effectiveness, *see Boyle*, 487 U.S. at 500, 108 S.Ct. at 2510, and where the three *Boyle* elements are satisfied, a military contractor is entitled to immunity from suit under state tort law. If state law would impose liability where the three *Boyle* elements are met, the requisite "significant conflict" is present, and state law is preempted.

There is no doubt that the *Boyle* defense can be established as a matter of law. Cases following *Boyle* have so held, either in the context of a motion for summary judgment, *see, e.g., Kleeman v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990); *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989); *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir.1989); *Niemann v. McDonnell Douglas Corp.*, 721 F.Supp. 1019 (S.D.Ill. 1989); *Nicholson v. United Technologies Corp.*, 697 F.Supp. 598 (D.Conn.1988), or in the context of a judgment notwithstanding the verdict, *see e.g., Boyle*, 487 U.S. at 514, 108 S.Ct. at 2519; *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311 (11th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). Although *Boyle* itself involved claims brought on behalf of a military serviceman, the defense also applies to claims brought against military contractors by or on behalf of civilians. *Boyle*, 487 U.S. at 510–11, 108 S.Ct. at 2517–18 (dicta); *Garner v. Santoro*, 865 F.2d 629 (5th Cir.1989); *Ramey v. Martin Baker Aircraft Co Ltd.*, 874 F.2d 946 (4th Cir.1989); *Nicholson v. United Technologies Corp.*, 697 F.Supp. 598 (D.Conn.1988).

*Boyle* holds that the government contractor defense is applicable to claims based upon design defects, 487 U.S. at 512, 108 S.Ct. at 2518, and most cases following *Boyle* have involved strict liability and/or negligence claims arising from design defects. *See, e.g., Harduvel v. General Dynamics Corp.*, 878 F.2d 1311 (11th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990); *Kleeman v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990); *Ramey v. Martin–Baker Aircraft Co.*, 874 F.2d 946 (4th Cir.1989); *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir.1989); *Niemann v. McDonnell Douglas Corp.*, 721 F.Supp. 1019 (S.D.Ill.1989); *Nicholson v. United Technologies Corp.*, 697 F.Supp. 598 (D.Conn.1988). The *Boyle* defense has been applied to claims of breach of warranty in tort arising from design defects. *Ramey*, 874 F.2d at 948. *See also Crossan v. Electron Tube Division of Litton Systems, Inc.*, 693 F.Supp. 528, 529 (E.D.Mich.1986) (government contractor defense applies to strict liability, negligence and breach of warranty claims) (citing *Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir.1986) and applying the *McKay* formulation of the elements of the defense). Several courts had held that the defense may be applied to failure to warn claims. *See, e.g., In re Joint Eastern & Southern District New York Asbestos Litigation*, 897 F.2d 626, 629 (2d Cir.1989); *Dorse v. Eagle–Picher Industries, Inc.*, 898 F.2d 1487 (11th Cir. 1990); *Garner*, 865 F.2d at 635; *Niemann*, 721 F.Supp. at 1024–25; *Nicholson*, 697 F.Supp. at 604 (claims arising out of alleged omissions in landing gear service manuals).

■ Plaintiffs allege that all three Defendants herein were negligent in failing to conduct certain tests of the airplane and its autopilot. *See* Plaintiffs' Liability Contentions, Doc. # 31, at 12–15; Plaintiffs' Mem-

orandum, Doc. # 219, at 21–34, 56. In one sense, such claims are clearly related to Plaintiffs' general negligent design claims, since the flight testing of the KC–135a, the C–135A and the EC–135N was an integral part of the process culminating in the ultimate configuration of the accident aircraft. On the other hand, Plaintiffs' negligence-in flight-testing claims can be viewed as setting forth a tort theory arguably separate from their negligent design claims. Therefore, the Court briefly addresses the applicability of *Boyle*, a design defects case, to Plaintiffs' flight testing claims.

The Court is unaware of any case applying *Boyle* to claims of negligence in testing a product pursuant to a government contract, and the parties have cited none to the Court. Where, as here, the testing of an aircraft produced pursuant to government contract is itself governed by that contract, the rationale of *Boyle* dictates that the defense be available to claims arising from alleged omissions in the testing process. Thus, if a military contractor were to be held liable for what is in effect a defect in the "Government-ordered design," *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518, *of the testing program* associated with a product designed under government contract, such liability would be as subversive of ·the Government's relationship with its contractors, and of the Government immunity under the "discretionary function" exception to the FTCA, as contractor liability for defects in government-ordered product design. In terms of the *applicability* of *Boyle*, therefore, this Court holds that Plaintiffs' flight testing claims are indistinguishable from their other claims related to the design of the accident aircraft.

■ Several courts following *Boyle* have been called upon to interpret the meaning of the elements of the government contractor defense. *Boyle* did not elaborate upon the meaning of government "approval of reasonably precise specifications," the first element of the defense. The Eleventh Circuit addressed this requirement in *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). *Harduvel* was a products liability action brought by the widow of an Air Force pilot killed when his F–16 fighter jet crashed. Plaintiff's theory of liability centered on defects in the F–16's all-electric control system. *Id.* at 1316. The jury returned a verdict for Plaintiff and the district court denied Defendant's motion for a judgment notwithstanding the verdict, which was based upon the version of the government contractor defense that the Supreme Court ultimately rejected in *Boyle*. The Eleventh Circuit reviewed the district court's decision in light of *Boyle*, which had been decided in the interim. *Id.* at 1315. The *Harduvel* Court described the "continuous back and forth" in the design process which it held satisfied the first element of *Boyle* as follows:

> The Air Force initiated the F–16 project in the early 1970's by issuing a Request for Proposals.... General Dynamics responded with proposed Air Vehicle Specifications, that were evaluated by the Air Force System Program Office. The Office conducted an extensive review of the aircraft, including the electrical system, examining specifications, drawings and blueprints.... One group of Air Force engineers was specifically assigned to review·the electrical system.... The Air Force conducted independent review and analysis of the electrical system design ... and evaluated designs in a Preliminary Design Review, Critical Design Review, and later Physical Configuration Audit that took place ... prior to the start of production.... Government review and approval of design and production methods continued after production began. Indeed, the Air Force requested an increase in wiring capacity on the particular block of F–16's from which Harduvel's came....

*Id.* at 1320 (citations omitted).

"[W]here, as here, the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved," the Court held, the first element of the *Boyle* defense is satisfied as a matter of law. *Id.* (quoting *Smith v. Xerox Corp.*, 866 F.2d 135, 138 (5th Cir.1989).

The *Harduvel* Court distinguished the Fifth Circuit's decision in *Trevino v. General Dynamics Corps*, 865 F.2d 1474, 1480 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989), upon which Plaintiffs in the instant case rely for the proposition (which this Court accepts) that mere "rubber stamp" government approval does not satisfy the first element of the *Boyle* defense. *See, e.g.,* Plaintiffs' Memorandum at 81–83. *Trevino* was an action brought under the Death on the High Seas Act, 46 U.S.C.App. § 761 *et seq.,* and under federal admiralty law, 28 U.S.C. § 1333, against General Dynamics by the survivors of Navy personnel who died when a vacuum formed in their submarine's diving chamber. 865 F.2d at 1476. The trial court held that General Dynamics was not entitled to the *Boyle* defense, and the Fifth Circuit affirmed. *Id.* The Court described the design and procurement process thus:

> *The contracts required General Dynamics* to produce working drawings of the [diving chamber] and the lock in/lock out system and *to assume full responsibility for all necessary technical research, to review its work product to assure compliance* with the [Navy's handbook of for modifications to the submarine], and *to conduct all quality assurance,* including inspection of the end product, before issue to the Navy. General Dynamics supplied 37 employees, who worked on-site at [the Navy shipyard] and produced 71 pages of detailed working drawings. Each of the drawings was signed by a government employee in a box marked "approved." After General Dynamics completed the drawings, their employees left [the shipyard], and the Navy performed all the manufacturing and conversion work on the [submarine].... *The Navy never performed nor required a formal design/safety review of the [submarine's] diving system prior to the accident.*

*Id.* at 1477 (emphasis added). It is in reference to this process that the *Trevino* Court held that the first element of *Boyle* was not satisfied and that "[a] rubber stamp is not a discretionary function; therefore, a rubber stamp is not 'approval' under *Boyle.* *Id.* at 1480. *Harduvel* also sheds light on the "conformity" element of the *Boyle* defense, by stating that the question whether this element is satisfied is answered by distinguishing between a *manufacturing* defect and a *design* defect. 878 F.2d at 1321. The distinction drawn by the Court is one between "an unintended configuration"—i.e., a defect in the workmanship of the particular product which failed—and "an intended configuration that may produce unintended and unwanted results"— i.e., a defect inherent in the design of the product the government has approved. *Id.* at 1317.

In *Kleeman v. McDonnell Douglas Corp.,* the Fourth Circuit also addressed the meaning of conformity and "reasonably precise specifications" under *Boyle.* 890 F.2d 698 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990). In *Kleeman,* a Navy pilot was killed when his F/A–18 aircraft went out of control during landing. *Id.* at 700. Plaintiffs brought a wrongful death action against McDonnell Douglas, alleging that the landing gear, which the Navy had implicated in the accident, failed to conform to the general performance specifications in McDonnell Douglas' contract with the Navy. The district court had held that the operative specifications to which the landing gear must conform under the first two elements of the *Boyle* defense were the "ultimate design specifications" that result from the design process, and not the "qualitative, precatory specifications used in [in the initial phases of] the procurement process." *Id.* The Fourth Circuit affirmed. Since there was no evidence in the record that the landing gear had failed to conform to "the precise quantitative specifications embodied in the totality of documents exchanged between the parties," *id.* at 702, the Court rejected Plaintiff's argument that the first element of *Boyle* had not been met. Failure of performance of the landing gear did not "equate as a matter of law with an absence of conformity" under *Boyle. Id.* at 700.

The *Kleeman* Court described the design and production process for the F/A–18, which closely mirrored that for the F–16 in *Harduvel.*[9] The Court stated that it is the "salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense." *Id.* at 701. "[A]ctive governmental oversight," the Court reasoned, "is relevant to all three elements of defendant's burden" under the defense. *Id.* The Court continued

> Where, as here, the Navy was intimately involved at various stages of the design and development process, the required government approval of the alleged design defect is more likely to be made out.... Similarly, the Navy's extensive participation, including reservation of the power to approve or disapprove design modifications, enhances the likelihood of final product conformity. Government involvement in the process also makes it more likely, though not certain, that a sharing of information will occur with respect to potential dangers in the use of the equipment. As a final matter, extensive governmental participation provides tangible evidence of the strong federal interest which justifies the creation of a federal common law defense for government contractors in the first place.

*Id.*

■ The third element of the *Boyle* defense, the requirement that the contractor "warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States," *Boyle* 487 U.S. at 512, 108 S.Ct. at 2518 requires the least discussion by this Court. The language of *Boyle* indicates that this element requires actual knowledge by the contractor. *Id.* Several Courts following *Boyle* have so held. *Har-*

*duvel,* 878 F.2d at 1321; *Trevino,* 865 F.2d at 1487; *Niemann,* 721 F.Supp. at 1028. As the *Kleeman,* Court stated, where there is evidence of pervasive government involvement in the procurement and design process, this element of the *Boyle* defense is more likely (though not certain) to be established. 890 F.2d at 701. In this Court's view, if Defendants actually knew of an asserted defect *and* alerted the Air Force thereto, or if the Air Force knew of the defect independently of anything the Defendants did or did not do, this element is established. *Harduvel,* 878 F.2d at 1322.

### B. *Affidavits of Colonel C. Russell Webb*

■ From July, 1954, through July, 1959, Colonel C. Russell Webb was Development Command Chief of the Air Force's Joint Weapons System Project Office for the KC–135A. Three affidavits executed by Colonel Webb are in the record before this Court. The first, dated July 10, 1984 ("July Affidavit"), forms the basis of Boeing's chronology of events surrounding the procurement of the KC–135A and its autopilot. Doc. # 151, Exhibit accompanying Boeing's original Motion for Summary Judgment. The second Webb affidavit, dated January 25, 1985 ("January Affidavit"), was obtained by Plaintiffs. Doc. # 159, Exhibit # 6. The third Webb affidavit, obtained by Boeing, is dated February 22, 1985 ("February Affidavit"). Doc. # 227, Appendix 1.

Plaintiffs contend that the January Affidavit "is sufficient standing by itself" to defeat the three instant Motions for Summary Judgment. Plaintiffs' Memorandum at 73. Without adverting to the February Affidavit, Plaintiffs also argue that the January Affidavit creates an issue of fact

---

**9.** The Court related the following:

Beginning with bids for what would become the F/A–18, teams of Navy engineers met with each contractor for extended discussion of their submissions. When the Navy selected MDC to develop and build the F/A–18, the final design contracts for the aircraft incorporated MDC's original proposal as modified during the extensive negotiations between the parties. During design development, MDC

was required to submit detailed engineering drawings to the Navy for approval. All changes to the design or specifications of the aircraft, required Navy approval, including proposals to address problems with the allegedly defective landing gear. The government also maintained an extensive staff of aircraft engineers on site at MDC's facilities in St. Louis.

*Id.* at 701.

as to the Air Force's "reliance" upon Defendants' "greater knowledge" about the 135 aircraft. *Id.* Plaintiffs also argue that the January Affidavit demonstrates that the Defendants, and not the Air Force, "designed" the aircraft and the components that Plaintiffs allege to be defective. *See, e.g.,* Plaintiffs' Memorandum at 46. The Court disagrees with these contentions. The January Affidavit consists of a series of terse, and the Court believes potentially misleading, statements giving the appearance of inconsistency with the earlier July Affidavit. Indeed, at oral argument on the instant motions, held on June 4, 1990, Plaintiffs' counsel maintained that all three Webb affidavits are internally inconsistent.[10] In order to demonstrate the *lack* of inconsistency among the Webb affidavits, the Court provides the following examples of statements which Plaintiffs claim give rise to a genuine issue of material fact.

*Example One*

In the July Affidavit, Col. Webb states: "As Chief of the Weapons System Project Office I participated actively in the development and negotiation of the initial 'Detail Specification' of the KC–135 in the summer and fall of 1954. The Detail Specification spelled out just what sort of aircraft the Air Force wanted. This specification incorporated by reference a large number of military specifications, military drawings, and Boeing drawings...."

July Affidavit at ¶ 9.

In the January Affidavit, Col. Webb states:

"Boeing, not the Air Force, prepared the Detail Design Specification for KC–135 airplanes."

January Affidavit at ¶ 2.

In the February Affidavit, Col. Webb states:

"In stating in my January affidavit (¶ 2) that 'Boeing, not the Air Force, prepared the Detail Design Specification for KC–135A airplanes,' I intended to say that

Boeing typed and printed the Detail Specification. It is also true that Boeing prepared much of the initial draft for the Detail Specification. The Final Detail Specification, as approved by the Air Force, however, was the product of a very substantial amount of Air Force input and many Air Force directed revisions. As I stated in my affidavit of July 10, 1984, the Air Force 'negotiated' the Detail Specification with Boeing."

February Affidavit at ¶ 2

*Example Two*

In the January Affidavit, Col. Webb states:

"The Air Force relied on Boeing's representations to the degree approved by the Air Force."

January Affidavit at ¶ 9.

In the February Affidavit, Col. Webb states:

"I said in my January affidavit (¶ 9) that "the Air Force relied on Boeing's representations *to the degree approved by the Air Force* " (emphasis added). Boeing's representations were simply input to the decision-making process. It was certainly input that I came to have a great deal of confidence in, but I was required always to make my decisions in terms of the effect on the military mission. I was required also to take into account Air Force policy and the judgments of Air Force engineers and pilots. Indeed, the Air Force "relied" on input from its own people in the same way that it relied on Boeing's input. The only input that would ultimately control a decision was a command input from my Air Force superiors."

February Affidavit at ¶ 8.

As these examples demonstrate, the February Affidavit, which is explanatory in nature, merely provides a clarification of what Colonel Webb meant by each statement set forth in the affidavit he executed for Plaintiffs. There is no inconsistency

---

**10.** For background regarding these *alleged* inconsistencies, *see* materials set forth in Appendix A.

between the January and February Affidavits; the statements set forth in each are based upon identical, and not opposing, premises. *See* Boeing's Reply Memo, Appendix 2, Doc. # 227. When read together, these affidavits are wholly consistent (and for the same reason) with the July Affidavit. Their statement to the contrary notwithstanding, Plaintiffs' January Webb Affidavit does not, therefore, create a genuine issue as to any fact, whether related either to Boeing's or to Lear's Motion, that is set forth in Colonel Webb's July Affidavit.

Finally, the Court is bemused by Plaintiffs' suggestion, Doc. # 219 at 73, that the January Affidavit could defeat MDC's Motion. None of the Webb affidavits concerns MDC; all merely concern the design of the C–135 and its autopilot, years before the A/RIA modifications were contemplated. As noted above, Colonel Webb left the KC–135A program in July 1959, before the A/RIA contract was awarded to MDC. January Affidavit, Doc. # 159, at ¶ 1.

■ As noted above, by introducing their January, 1985, Webb Affidavit, and by citations to the depositions of other Air Force personnel, Plaintiffs seek to inject into this case the issue of Air Force reliance upon Boeing's and Lear's expertise and "higher knowledge" concerning the KC–135A and its autopilot. Plaintiffs assert that "the United States relied upon Boeing's and Lear's expertise in designing the KC–135 and its flight control system." Plaintiffs' Memorandum at 51. Indeed, Colonel George Leslie[11] and Wilson Hale[12] testified in depositions that the Air Force had relied on the expertise of Boeing and Lear, respectively, in designing the aircraft and autopilot. *Id.* at 51–53 (quoting Leslie Deposition at 19–20; Hale Deposition at 64–65). In his January Affidavit, Colonel Webb also stated that the Air Force "relied" upon

Lear's higher knowledge and expertise. Doc. # 159, Exhibit # 6. Plaintiffs also quote the deposition testimony of Maurice L. Fowler, the Air Force's contracting officer for the A/RIA program, that the Air Force relied on MDC to "meet its contract." *Id.* at 55 (quoting Fowler Deposition at 23, 26–28). The issue whether the Air Force relied upon these Defendants' expertise and "higher knowledge" as aircraft designers and manufacturers, however, is *not* relevant to the *Boyle* defense, and is therefore not an issue of fact material to the instant Motions.[13] The Air Force's reliance is, in fact, beside the point, for *Boyle* fully contemplates such reliance as necessary to the military procurement process. 487 U.S. at 512–13, 108 S.Ct. at 2518–19. The *Boyle* Court sought to *encourage* the active involvement of military contractors in the design process, and held that such contractors are immune from suit under state tort law, as long as the design features at issue had been considered by the Government and not *solely* by the contractor. *Id.* at 512, 108 S.Ct. at 2518.

■ Plaintiffs have repeatedly sought to structure the Court's inquiry under *Boyle* so as to require the Court simply to determine who, as between the Defendant contractors and the Air Force, "designed" the KC/C–135, its autopilot and the A/RIA modifications. Relying upon the deposition testimony of Air Force personnel, Plaintiffs assert, specifically, that Boeing (and not the Air Force) "prepared" the Detail Specification for the KC–135 series aircraft, Plaintiffs Memorandum at 45 (quoting Leslie Deposition at 20, 33, 118), and that Boeing "prepared" the specifications for the autopilot, which specifications were incorporated into the contract between Lear and the Air Force, *id* at 48 (quoting Hale Deposition at 59–60). Plaintiffs also quote the

11. Colonel George A. Leslie was the Air Force's Chief of Procurement for the KC–135A.

12. Wilson E. Hale was an Air Force flight control systems engineer, and Unit Chief, Cargo Transport and Miscellaneous Air Craft Unit, Automatic Flight Control Section, Air Research and Development Command, stationed at WADC. Mr. Hale's section was responsible for

design and development of the automatic flight control system for the jet tanker project. *Id* at ¶¶ 4–5, 10.

13. The issue whether any Defendant in this case actually knew of alleged design defects of which the Air Force was unaware *is,* of course, directly relevant to the *Boyle* defense.

testimony of Mr. Wilson Hale that "Lear had to *design* the detailed components of the autopilot." *Id* (emphasis added). Plaintiffs further assert that MDC (and not the Air Force) "designed" the A/RIA modifications, and "MDC's design concept" was incorporated into its contract with the Air Force. *Id.* at 53.[14]

Plaintiffs misconstrue the focus of this Court's inquiry under *Boyle.* The principal issue for this Court is not who "designed" the particular features of the EC–135N which Plaintiffs assert were defective, but whether the Air Force approved specifications for those features which were reasonably precise. Therefore, the argument that a Defendant's "design" or "design concept" became part of its contract with the Air Force, supports, rather than vitiates, the *Boyle* defense. It is necessary under *Boyle* merely that a contractor incorporate the government's performance specifications into "a design that the government subsequently review[s] and approve[s]." *Harduvel,* 878 F.2d at 1320. If this occurs in the context of a design process marked by continuous interchange between the contractor and the government (and subject to government final approval of the design), the fact that the particular "design concept" at issue was the contractor's does not of itself defeat the defense.[15]

**14.** Plaintiffs also assert that "full design discretion was allowed to potential A/RIA contractors" and as support for this proposition cite the Court *only* to the following excerpt from the record:

Q. 17. Format B

1. To what extent can contractor deviate [from] this format?

\* \* \* \* \* \*

A. Full contractor discretion is allowed in accomplishing Format B. The assumptions and basis used should, however, be indicated. After considerable effort, this Court has located the referenced excerpt, not in "Exhibit 14," as Plaintiffs would have it, Plaintiffs' Memorandum at 54 n. 18, but in MDC's original Exhibit A, resubmitted as MDC Exhibit A–1, at 79.

The Court can only conclude that by referencing this minute excerpt, Plaintiffs hope to create in the Court's mind a triable issue related to "full contractor discretion." The Court does not follow Plaintiffs' lead, however, for the following reasons. This excerpt, as the Court has discovered and Plaintiffs have neglected to state, is from a transcript of questions submitted by potential contractors in a conference with the Air Force during the earliest stage of the A/RIA procurement process, the Request for Proposal (RFP) stage. The contractors' questions, and the answers thereto that were ultimately provided by the Air Force, were incorporated into the RFP for the modifications. MDC Exhibit A–1. The record does not disclose, and Plaintiffs have not alluded to, the meaning of the term "Format B." It is therefore impossible to guess the import of this excerpt. It is, however, obvious to this Court, based upon uncontested facts set forth by MDC in support of its Motion for Summary Judgment, that MDC was given anything but "full design discretion" in the A/RIA program, as the Court's discussion below fully indicates.

**15.** In support of their argument that the instant Motions for Summary Judgment should be overruled, Plaintiffs rely upon the opinion in

*Deniston v. The Boeing Company,* No. 87–CV–1205, *slip op.,* 1990 WL 37621 (N.D.N.Y. March 28, 1990) (available on LEXIS, 1990 U.S. Dist. LEXIS 3509). Plaintiffs' Omnibus Reply Memorandum, Doc. # 224, Appendix A. *Deniston,* a case brought under the Death on the High Seas Act, 46 U.S.C.App. § 761 et seq., involved the crash at sea of a Navy helicopter whose stabilization augmentation system was implicated as a cause of the crash. The *Deniston* Court overruled Boeing's motion for summary judgment based on the *Boyle* defense, in part because a statement in the helicopter's manual described the helicopter as "a twin-turbine-powered dual-piloted tandem-rotor helicopter, designed by Boeing Vertol Company." *Slip op.* at 13. This statement, the Court held, was sufficient alone to raise an issue of material fact as to who designed the helicopter. *Id.* The Court also held that, in part because Plaintiffs' theories of recovery had not been clearly defined, the record was not sufficiently developed to enable the Court to determine whether the section of the helicopter's Detail Specification relied upon by Boeing was the relevant "reasonably precise" specification, within the meaning of *Boyle. Id.* at 15.

Plaintiffs in the instant case argue that, "[l]ike in *Deniston,*" the Defendants herein "designed" the KC–135A, its MC–1 autopilot and the A/RIA modifications and that, therefore, their Motions for Summary Judgment must be overruled. Doc. # 224 at 17–18. As an initial matter, the record in the instant case contains no document containing a statement comparable to that found partially dispositive by the *Deniston* Court. Even if the record contained such a statement, this Court would respectfully disagree with the *Deniston* Court's assessment of its import. As previously stated, this Court does not view the question of who "designed" the accident aircraft and its autopilot to be material to the *Boyle* defense. The issue material to the first *Boyle* element is whether the government has approved reasonably precise specifications. Indeed, the *Deniston* Court itself stated as much,

## III. PROCUREMENT, DESIGN AND DEVELOPMENT HISTORY OF THE EC–135N

### A. *Introduction*

The following chronology of the procurement, design and development of the EC–135N is derived from uncontroverted facts set forth by Defendants in support of their Motions for Summary Judgment. The aircraft involved in the tragic accident giving rise to this litigation was manufactured and delivered by Boeing to the Air Force in 1961 as a C–135A personnel and materiel transport. Smith Affidavit at ¶ 16; [16] Shanks Affidavit at ¶ 31.[17] As delivered, the C–135A was equipped with an automatic flight control system (hereinafter "autopilot" or "MC–1") designed and built pursuant to specifications in a contract between the Air Force and Lear's predecessor, Lear, Inc., and supplied to Boeing by the Air Force as Government Furnished Aeronautical Equipment ("GFAE") for installation in the aircraft by Boeing. Webb Affidavit at ¶ 20; [18] Utterstrom Affidavit at ¶ 7; [19] Hale Affidavit at ¶¶ 8, 16.

The C–135A is a modified KC–135A jet tanker. In 1952, Boeing had begun work on its model 367–80 ("Dash 80"), a prototype four-engine jet transport having potential for both military and commercial use. Shanks Affidavit at ¶ 4. In 1954, the Air Force announced a design competition for a new jet tanker to be used for mid-air refueling of its B–52 bomber, and Boeing submitted a proposal based on the Dash 80. Webb Affidavit at ¶¶ 2, 6–7. Although Boeing did not win that competition, the advanced stage of development of the Boeing proposal resulted in, first, the selection of the Boeing proposal for an "interim" order for tankers, to be designed and delivered on an expedited basis, and denominated KC–135A's. Shanks Affidavit, ¶ 31. Second, when the Air Force decided to employ KC–135As as its B–52 refueling tankers, Boeing was awarded the long-term contract for their design and manufacture. Smith Affidavit at ¶ 15; Webb Affidavit at ¶ 8. In 1961, seven KC–135A jet tankers in production, including the accident aircraft, were modified by Boeing, again pursuant to a contract with the Air Force, to convert them into personnel and material transports. Shanks Affidavit at ¶ 31. The C–135A is (for all intents and purposes relevant to the instant litigation) simply a KC–135A with its air refueling boom and certain fuel tanks removed. Smith Affidavit at ¶ 16; Shanks Affidavit at ¶ 31.

In 1965, MDC was awarded an Air Force contract to modify the accident aircraft and seven other Air Force C–135s (to convert them for use in the Apollo Space Program) by installing electronic telemetry equipment and by making certain modifications to the aircraft's interior and nose to accommodate that equipment. Barnes Declaration ¶ 2; [20] MDC Exhibit A–1 at 16. As

---

when it held that it would find the requisite government approval "if either the government itself selected or proposed the allegedly defective design features or if those design features were approved by the government following active consideration, which may be demonstrated by a 'back and forth' between the government and the contractor." *Slip op.* at 12. As this Court's discussion will show, the record in this case establishes that just such "back and forth" took place between the Air Force and the Defendants herein.

**16.** From 1956–65, Lawrence F. Smith was head of the engineering section of the Air Force office located in Boeing's Seattle, Washington facility. The engineering section monitored compliance of the KC–135A and its modifications to the Detail Specification. *Id.* at ¶¶ 3, 4–11.

**17.** From 1954–57, Robert G. Shanks was Boeing's Contract Specification Engineer for the KC–135A. From 1957–65, Mr. Shanks was the C/KC–135 Project Group Engineer concerned with contracts, general administration and testing. *Id.* at ¶ 3.

**18.** Unless otherwise specified in text, citations to the Webb Affidavit refer to Colonel Webb's July 10, 1984 affidavit, unnumbered Exhibit accompanying Doc. # 151.

**19.** From 1954–55, John R. Utterstrom was the Boeing employee in charge of the technical aspects of autopilot acquisition. Mr. Utterstrom oversaw preparation of the KC–135A performance specification for the autopilot (D10–2572). *Id.* at ¶ 3.

**20.** From October, 1965 to February, 1967, Edward M. Barnes was the MDC Program Director for the A/RIA Program. *Id.* at ¶ 1.

modified by MDC, the aircraft was designated an EC–135N and redelivered to the Air Force in late 1967. Barnes Declaration at ¶ 25.

### B. *Procurement and Design of the KC–135A*

As the Court understands it (and as has been amply documented by Boeing by means of affidavits of various Boeing and Air Force personnel and accompanying exhibits), the procurement process leading to the final design and configuration of the KC–135A was a cumulative one which lasted through the flight testing phase. Thus, Boeing's original design proposal, based on its "DASH 80" prototype, submitted to the Air Force in the design competition phase of procurement, was not the ultimate design of the KC–135A. Many systems on the KC–135A, and particularly those which Plaintiffs have implicated herein, differed from those on the Boeing prototype. Webb Affidavit (February 22, 1985), Doc. # 227, Appendix 1, at ¶ 5.[21] Item-by-item negotiations ensued between the Air Force and Boeing, with the Air Force having the final decision as to each design item. Webb Affidavit at ¶¶ 10–11; Smith Affidavit ¶¶ 2, 4–5, 7, 9, 10, 24–25; Shanks Affidavit ¶¶ 10, 12, 14–15, 20, 22. These negotiations resulted in the KC–135A Detail Specification, i.e., the specification which, along with the documents and drawings it incorporates, told Boeing exactly how to build the aircraft.

Air Force responsibility for supervision, control and direction of the KC–135A design and manufacturing effort lay in a joint Systems Project Office. Shanks Affidavit, Exhibit N–10. Within the Systems Project Office, responsibility was shared by the Air Force Material Command, which was in charge of coordinating and overseeing manufacturing and matters relating to maintenance and support, and the Development Command, in charge of design development. Webb Affidavit at ¶ 4. The Chief of the Development Command was sup-

ported by the laboratories and engineers of the Wright Air Development Center ("WADC"). *Id.* at ¶ 5. A large number of Air Force engineers having expertise in the entire range of aeronautical specialties participated in the technical reviews of the KC–135A project. *Id.* at 10; Leslie Deposition, Doc. # 222, Exhibit 4, at 45–47, 89.

Once the initial draft of the Detail Specification was agreed upon in the summer of 1954, procedures were developed for implementing Air Force concerns or evaluations regarding design development through the Engineering Change Proposal ("ECP") process. Shanks Affidavit at ¶ 3; Webb Affidavit at ¶ 11. It was only through this process that Boeing could submit to the Air Force its suggestions for deviations from, i.e., design changes in, the Detail Specification for the aircraft. ECPs did not become effective absent Air Force approval thereof. Leslie Deposition at 20. There were bimonthly design-related meetings between Boeing and Air Force personnel at which ECPs were considered and approved or disapproved by the Air Force; these meetings began in the fall of 1954 and continued to take place throughout the production phase of the process. Shanks Affidavit at ¶¶ 7, 10 and accompanying Exhibits C–1 and C–2.

In the course of KC–135A development, mock-up inspections of the cockpit, Townsend Affidavit at ¶ 3, and ultimately a full-scale mockup of one side of the aircraft, Smith Affidavit at ¶¶ 6, 7; Shanks Affidavit at ¶¶ 13–14, as well as other technical reviews and inspections, were conducted by Air Force personnel including pilots, officers, engineers and contract personnel. Shanks Affidavit ¶¶ 11–13, 16. A Development Engineering Inspection, conducted by fifty Air Force engineers under the direction of Colonel C. Russell Webb, Chief of the Development Command, took place on March 8–10, 1955. Shanks Affidavit at ¶ 12. This inspection involved evaluation

---

**21.** The "DASH 80" had no autopilot, no alternating current electrical system, AC generators or constant speed drives. *Id.* Furthermore, it had two manual trim wheels. *Id;* Affidavit of Guy M. Townsend, at ¶ 2. Mr. Townsend was an Air Force test pilot stationed at the Boeing facility in Seattle during the initial development of the KC–135A. Since 1970, he has been Boeing's Military Program Manager. *Id.* at ¶¶ 1, 3.

of the design's conformity to Air Force requirements; and where Boeing and Air Force engineers differed on aspects of the design, Colonel Webb made the final design determination. Smith Affidavit at ¶ 5. The full-scale mock-up conducted by Air Force personnel involved inspection of the model and relevant drawings, again with the Air Force as final arbiter of design disputes between Boeing and Air Force personnel. Webb Affidavit, ¶ 13. The final Air Force review of the KC–135A before flight testing, the Contract Technical Compliance Inspection ("CTCI") or "rollout conference," took place in July, 1956. Smith Affidavit at ¶ 9. The CTCI's purpose was to assure that the aircraft complied with the Detail Specification, as it had evolved, to conduct design analysis and to recommend changes if necessary. Shanks Affidavit Exhibit I. This extensive review resulted in a number of Air Force requests for design changes. *See, e.g.,* Shanks Affidavit, Exhibit J. After requiring those changes, the Air Force CTCI Board accepted the KC–135A as being manufactured in compliance with its Detail Specification. Smith Affidavit at ¶ 9; Shanks Affidavit, Exhibits J and K.

There was, throughout the design and manufacturing process, a steady stream of correspondence between the Air Force and Boeing. Webb Affidavit at ¶ 23. From 1956 to 1965 an Air Force engineering section office was located at the Boeing plant in Seattle. Smith Affidavit at ¶ 3. This office monitored Boeing compliance with design specifications under the contract and was involved in the process by which design changes in those specifications were approved or disapproved by the Air Force. *Id.* at ¶¶ 4–10. It was also involved in the design of the aircraft's flight test program and in analysis of test data. *Id.* at ¶ 11. Flight tests were carried out by Air Force personnel, and by Boeing and Air Force personnel jointly. *Id;* Webb Affidavit at ¶¶ 18–19.

## C. *Procurement and Design of the MC–1 Autopilot*

The Boeing DASH–80 prototype from which the Detail Specification for the KC–135A was developed did not have an autopilot. Webb Affidavit (February 22, 1985), Doc. # 227, Appendix 1, at ¶ 5. The Air Force determined that an automatic flight control system was "mission essential" for the KC–135A, because the jet tanker would necessarily fly long missions during which an autopilot could provide relief for the crew. Hale Affidavit at ¶ 13. As noted above, the Air Force procured the MC–1 autopilot with which the accident aircraft was equipped from Lear and supplied it to Boeing as Government Furnished Aeronautical Equipment ("GFAE"). In the 1950s, the Air Force procured subsystems, including automatic flight control systems, as GFAE directly from the subsystem manufacturer, for installation by the aircraft ("airframe") manufacturer, because, *inter alia,* the GFAE process allowed the Air Force to be directly involved in design and development of such subsystems. *Id.* at ¶¶ 8–9.[22]

Pursuant to its contract with the Air Force, Boeing prepared the performance specification[23] for the jet tanker's autopilot (this document is designated D10–2572). *Id.* at ¶ 14 and accompanying Exhibit A. Also pursuant to its Air Force contract, Boeing prepared document D–14095, which defined characteristics of the *aircraft* necessary for the design and analysis of the autopilot. *Id.* and accompanying Exhibit B (which incorporates document D10–2572 by reference). Both the performance specification and document D–14095 were the result of detailed discussions between Air Force personnel and Boeing. *Id.* Although the performance specification, as initially drafted by Boeing, gave Boeing a role in approving the autopilot's Detail Specification and in qualifying the autopilot, the Air Force ordered a revision of the

---

**22.** The alternative, allowing the aircraft manufacturer to subcontract out a given subsystem, apparently provided for less Air Force control in the design and development process. *Id.* at ¶ 9.

**23.** A performance specification sets forth general performance requirements, and not complete precise quantitative manufacturing requirements, for a given piece of equipment.

performance specification that denied Boeing any such role. Utterstrom Affid. at ¶ 4–5.

The Air Force initially sought to acquire an "off-the-shelf" autopilot system, and pursuant to that interest Boeing undertook a study of several existing autopilots, including one manufactured by Lear, the Lear L–10. Hale Affid. at ¶ 10 and accompanying Exhibit C. Although it felt that both the L–10 and an autopilot produced by Minneapolis–Honeywell ("MH–43") would serve the purpose equally well, Boeing recommended the MH–43 over the L–10. Hale Affidavit, Exhibit C. Ultimately, in any event, the Air Force rejected Boeing's recommendation. The Air Force's own analysis led it to conclude that new autopilot system development, and not an "off-the-shelf" autopilot, was called for. Hale Affidavit at ¶ 15.

On March 4, 1955, the Air Force issued a Request for Proposals ("RFP") for development of an autopilot system to major manufacturers of automatic flight control systems. *Id.* at ¶ 20; C. Brown Affidavit at ¶¶ 5–6.[24] The RFP incorporated both document D–14095 and the performance specification (D10–2572), which had undergone review by Air Force entities including the Strategic Air Command (the user command), the Air Logistics Command, and other Air Force engineering groups. Hale Affidavit at ¶ 19. The Systems Project Office's autopilot contracting office had also made revisions in the performance specification. *Id.* Thus, the performance specification was approved by the Air Force for

procurement of the autopilot before Lear's selection as the contractor. *Id.* at 16.

■ On April 3, 1955, Lear submitted its proposal in response to the RFP. C. Brown Affidavit at ¶ 7. The Air Force conducted both contracting reviews and technical reviews of all proposals. Technical feasibility studies were conducted by the automatic flight control system group as well as Air Force engineers in other aeronautical disciplines. Hale Affidavit at ¶¶ 23–25. After these reviews were completed, Lear was awarded the contract for the autopilot, which the Air Force denominated "MC–1," in June of 1955. *Id.* at ¶ 26; C. Brown Affidavit at ¶ 7.[25]

As was true for the procurement of the KC–135A, the awarding of the contract to Lear does not signify that the autopilot's design was at that point set in concrete. Indeed, once the contract was awarded, negotiations began among Boeing, Lear and the Air Force, the purpose of which was to develop the detail specification for the autopilot by expanding upon and refining the requirements of the performance specification (D10–2572) and document D–14095. Hale Affidavit at ¶¶ 28, 30; C. Brown affidavit at ¶ 10. These discussions continued through the fall of 1955. The Air Force set up offices, staffed by full-time Air Force personnel, at both Boeing's and Lear's production facilities in order to oversee the autopilot's design and development. Hale Affidavit at ¶ 28.

Lear prepared draft detailed specifications for each autopilot component after

---

**24.** Charles H. Brown was a Lear project engineer who reported to the Chief Project engineer during the preparation of Lear's autopilot proposal, and later became Chief Project Engineer in Lear's autopilot program. *Id.* at ¶ 7.

**25.** Plaintiffs argue that Lear cannot, "as a matter of law," prove any element of the *Boyle* defense because it has not produced either its contract with the Air Force or a specification for the autopilot as a whole. Plaintiffs' Memorandum at 89. The Court views this argument as nothing more than a red herring. There is no serious dispute that Lear was a party to a contract with the Air Force for the design and development of the KC–135A's autopilot system. Indeed, Charles Brown, Lear's autopilot project engineer, sets forth the contract number (AF

33(600)–30586) and the date it was awarded. C. Brown Affidavit at ¶ 7. Mr. Brown's affidavit explains that neither the original development/production contract, nor subsequent production contracts, have been retained by Lear over the twenty-five years since issuance of same and the initiation of this lawsuit. More important, in this Court's view, is the presence in the record of the detail specifications, with attendant Air Force-approved revisions thereto, for the autopilot's components. *Id.*, accompanying Exhibits C1–C16. The Court has found no case, and Plaintiffs cite none, standing for the proposition that these detail specifications are not "specifications" within the meaning of *Boyle.*

consultation with Boeing and the Air Force. *Id.* at ¶ 30; C. Brown Affidavit at ¶ 11. In December, 1955, having concluded that the detailed specification for the autopilot was in a sufficiently advanced state of development, the Air Force authorized Lear to building four prototypes. The first of these was delivered to Boeing in January, 1956. Hale Affidavit at ¶ 31. It was subjected to flight simulator testing by Boeing, which testing necessitated design changes. *Id.*

In the course of the autopilot's design development, the ECP process was employed. Thus, where Lear or Boeing suggested changes in the developing autopilot detailed specification, the Air Force had first to give its approval for a request for an ECP. If that approval was given, Lear then had to submit the ECP to the Air Force for a second level of review. *Id.* at ¶ 31–¶ 32; C. Brown Affidavit at ¶¶ 15–16. The Air Force had the final decision regarding all design changes. Once the design changes necessitated by flight simulator testing had been effectuated, the prototype autopilot was installed in Boeing's prototype aircraft and flight tested, by Boeing and the Air Force, from April to August, 1956. Hale Affidavit at ¶ 33. Lear employees were observers to the flight testing, and made recommendations as to testing content. Further changes in the autopilot following flight testing were also handled by the ECP procedure, with Air Force final approval a continuing requirement. *Id.*

After flight testing by Boeing and the Air Force in August, 1956, was complete, the Air Force ordered Lear to start production of the MC–1 for installment into KC–135As as they were produced. *Id.* at ¶ 34. Additional changes to the autopilot were required by the Air Force (as a result of Air Force testing and analysis) during the production phase, which changes were incorporated into the detail specifications for the components. C. Brown Affidavit at ¶ 18. The first KC–135A to have an MC–1 in its final configuration was flight tested

by the Air Force in 1958. Hale Affidavit at ¶ 37. After it flight-tested this aircraft, the Air Force determined that no further development was required for the autopilot. *Id.* Once the Air Force had determined that the detail specifications for the components were in their final form, Lear was required to retrofit autopilots produced in advance of that determination. C. Brown Affidavit at ¶ 18.[26] The retrofitting was completed in 1959. *Id.* With the incorporation of these changes, the Air Force determined that the autopilot met its detail specifications, which were incorporated into the Detail Specification for the aircraft. The Air Force approved the Detail Specifications for each component and designated the autopilot as standard equipment. Hale Affidavit at ¶ 40.

### D. *Procurement and Design of the C–135A*

As noted above, the C–135A is essentially a KC–135A with its refueling boom removed. Shanks Affidavit at ¶ 31. In 1960, the Air Force determined that it had the need, on an expedited basis, for a jet transport aircraft. Smith Affid. at ¶ 16. Given the perceived urgency of this need, the Air Force determined to make modifications to KC–135A's that were already in production. The Air Force executed a contract (No. AF33(600)–41979) with Boeing for production of seven modified KC–135A's, designated C–135As. Shanks Affid. at ¶ 31 and accompanying Exhibit U at "Administrative Commitment Document." This contract required that the modified aircraft be designed and manufactured in accordance with the Detail Specification for the KC–135A. *Id.* at ¶ 32 and Exhibit V. The accident aircraft (Serial # 61–0328) was supplied to the Air Force pursuant to this contract. *Id.* at ¶ 31.

Negotiations between Air Force personnel (including engineers representing the Systems Procurement Office and the Military Air Transport Service) and Boeing, structured by the ECP process, led to a

---

**26.** The detail specifications for the autopilot components, which are Exhibits C1–C16 to the

C. Brown affidavit, are in their final form.

Detail Specification for the C–135A aircraft. Smith Affid. at ¶ 16. Twenty ECP's approved by the Air Force comprised the basic differences between the Detail Specification for the KC–135A and that for the C–135A. *Id.* The Air Force had final authority regarding all design choices in the C–135A Detail Specification. *Id.* at ¶¶ 16, 19; Shanks Affid. at ¶¶ 10, 12, 21, 32.

A CTCI was conducted by the Air Force for the C–135A in 1961, for the purpose of evaluating whether the aircraft was in compliance with its Detail Specification, and with particular emphasis upon safety of flight considerations. Smith Affid. at ¶ 19. After requiring certain design changes, the CTCI Board accepted the C–135A as conforming with its Detail Specification. *Id.* Each individual C–135A was further subjected to both ground inspection by the Air Force after rollout from the production line and Air Force flight testing, to insure compliance with the contract. This process was overseen by the Air Force Quality Control Division, and compliance with the Detail Specification was a prerequisite for acceptance and purchase of each C–135A by the Air Force. *Id.* at ¶ 21. Occasionally, Air Force acceptance was authorized subject to correction of specified deficiencies uncovered in this final review and testing process. *Id.* and accompanying Exhibit A.[27]

### E. *Procurement and Design of the A/RIA Modifications*

On October 4, 1965, MDC was awarded an Air Force contract to convert eight Air Force C–135As into Apollo Range Instrumented Aircraft ("A/RIA") by installing communications and telemetry equipment and performing certain modifications to the interior and nose of the aircraft. Barnes Declaration at ¶ 8; MDC Exhibit A–9. As Plaintiffs note, the process by which MDC was awarded its contract with the Air Force was much the same as that leading to the awarding of Boeing's contract for the KC–135A. Plaintiffs' Memorandum at 55. Since the Air Force intended that the C–135As be modified on an expedited basis, it employed its "Series 375" procurement regulations, which called for Air Force control of contractors' efforts at all levels. Barnes Declaration at ¶ 3.

The salient features of the procurement process as it relates to MDC are as follows. On January 18, 1965, the Air Force issued a RFP from contractors for installation of electronic equipment on eight C–135As, including the accident aircraft, and for modifications to accommodate that equipment. Barnes Declaration at ¶ 2; MDC Exhibit A–1. The RFP was itself the result of intensive Air Force research and development and contained performance and design specifications for the A/RIA aircraft.[28] *See* MDC Exhibits A–2 (Performance and Design Requirements); A–3 (Statement of Work); and A–5 (Engineering Specification). In the course of its own development of the A/RIA modifications, the Air Force set up a Systems Program Office staffed with engineers and technical advisors, whose function would be to review and assist in development of A/RIA contract proposals. MDC Exhibit B, Fowler Deposition, at 30, 65–67.

---

**27.** Exhibit A accompanying the Smith Affidavit is an example of a Department of Defense ("DOD") Form 250 which, when signed by Air Force personnel, indicates Air Force acceptance of a contracted-for item as being in compliance with the contract. The DOD Form 250 for the accident aircraft, SN61–0328 as an unmodified C–135A is not in the record before this Court. *See* Boeing Memorandum, Doc # 221, at 33 n. 14. Plaintiffs do not, however, dispute that the Air Force accepted the accident aircraft as conforming. Plaintiffs do contend, however, that the Air Force's approval and acceptance of the accident aircraft was vitiated, for purposes of the *Boyle* defense, because the Defendants "misled" the Air Force, or allegedly did not alert the Air Force, to the defects which Plaintiffs assert contributed to the accident herein. Thus, according to Plaintiffs, the Air Force would not have accepted the aircraft had it known of these alleged defects. *See, e.g.,* Plaintiffs' Memorandum at 87–88. The Court has found no evidence in this record that any of the Defendants misled the Air Force as to any alleged defect herein.

**28.** This Air Force research included a Feasibility Study by the Air Force Oklahoma City Air Materiel Area ("OCAMA") suggesting the bulbous nose configuration for the C–135A that ultimately became part of MDC's modifications. MDC Exhibit A–31.

Based upon proposals submitted in response to the RFP, MDC and a second contractor were given fixed-price contracts to refine the A/RIA specifications and develop cost and scheduling proposals. Barnes Declaration at ¶ 5. During this "Definition Phase" of the procurement process, MDC consulted with the Systems Project Office in the development of its design refinements and that Office, in turn, conducted frequent technical and design reviews. *Id.* at ¶ 6. MDC submitted sixty-three volumes of reports in support of its design approach for the A/RIA system; the Air Force ordered changes to those specifications, some of which "significantly altered" MDC's proposals. *Id.* at ¶ 7.

MDC was awarded the A/RIA contract on October 4, 1965. *Id.* at ¶ 8; Exhibit A–9 (Contract # AF 19(628)–4888). There then ensued the intensive design phase of the A/RIA project, during which MDC submitted specifications, drawings and designs for Air Force approval. Barnes Declaration at ¶ 9; MDC Exhibits A–10, A–11. The contract, in terms, prohibited design changes not approved by the Air Force. Exhibit A–9 at 22. The ECP process described above in the discussion of the KC–135A and C–135A procurement was also employed in the A/RIA development process. Thus, Air Force consent was required for design changes and deviations from Air Force-approved performance specifications. Barnes Declaration at ¶¶ 10–11; Exhibits A–12—A–15.

The involvement of Air Force personnel in the manufacturing and installation phases of the A/RIA project was pervasive and included numerous technical reviews and inspections to assure compliance with specifications under the contract. Air Force personnel were assigned to MDC's plant in Tulsa, Oklahoma. Barnes Declaration at ¶¶ 12–13. When, following a First Article Configuration Inspection, the Air Force determined that a deviation from the specifications was warranted, or that a particular aspect of the modifications was not in compliance with the specifications, MDC was required to make the appropriate adjustments before the item under consideration was deemed acceptable to the Air Force. *Id.* at ¶ 14. As in the case of the C/KC–135A procurement and manufacture, the was a constant flow of communication between MDC and the Air Force on even the minutest of issues. Under the contract, MDC was required to submit extensive monthly reports outlining such matters as progress in engineering, design and installation. *Id.* at ¶¶ 16–17. The contract imposed strict and exhaustive requirements concerning the testing of components by MDC and the reporting of test results to the Air Force. *Id.* at ¶¶ 17–18, Exhibits A–21, A–22. Finally, as will be developed more fully below, MDC's contract with the Air Force governed MDC's testing of the modified aircraft, designated an EC–135N. Flight testing was accomplished by MDC alone (with Air Force monitoring), by MDC and the Air Force jointly, and finally by the Air Force alone. Barnes Declaration at ¶¶ 20–22. MDC delivered the accident aircraft (A/RIA # 8) to the Air Force in December, 1967. After a final inspection, the Air Force indicated its formal acceptance of the aircraft by executing a Department of Defense Form 250 (Material Inspection and Receiving Report). *Id.* at ¶ 25.[29]

## IV. ANALYSIS

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. On a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine

---

**29.** The DOD Form 250 for the accident aircraft is not before the Court, MDC having destroyed it long ago in accordance with its document retention policies. *Id.*

issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R. Civ.P. 56(e)). Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Having set forth the applicable analytical framework, the Court now turns to analysis of the instant Motions for Summary Judgment.[30]

### A. *Plaintiffs' Design Defect Claims*

#### 1. Boeing

■ For the following reasons, the Court holds that Boeing is entitled to immunity under *Boyle* from Plaintiffs' design defect claims. The procurement and design process culminating in the December, 1961, delivery of the accident aircraft to the Air Force as a C–135A demonstrates the active governmental involvement and oversight which is the hallmark of the defense. *Kleeman,* 890 F.2d at 701; *Harduvel,* 878 F.2d at 1320. The Detail Specifications for the KC–135A and the C–135A were the products of constant interaction and negotiation between Boeing and the Air Force, always subject to Air Force's final judgment. The Air Force contract pursuant to which the accident aircraft was manufactured required that the aircraft be built to conform to the Detail Specification for the KC–135A. Shanks Affidavit at ¶ 32 and Exhibit U. Air Force approval was required for all Boeing designs and drawings, and Boeing was not free to deviate from the Detail Specification, absent Air Force-ordered changes and/or Air Force approval of changes Boeing recommended. *Id.* and

Exhibit V. The specificity with which the Detail Specification set forth the details of the KC–135A's design was such that it could have been used as a blue print by any aircraft manufacturer to build the same aircraft. Webb Affidavit at ¶ 9; Leslie Deposition, Doc. # 222, Appendix 4, at 43, 68.

The principal design features alleged by Plaintiffs to be defects in the aircraft were required by the Detail Specification. Setting aside for the moment Plaintiffs' allegations concerning the EC–135N's autopilot, Plaintiffs have implicated the placement of the single manual trim wheel on the left side of the aisle stand between the pilots' seats (and the fact that there was only one such wheel); the placement of the electrical trim switches on the pilot's control wheel; the rate of trim movement and the amount of movement allowed the horizontal stabilizer by its trim limit switches; the type and location of indicators and warning lights related to trim motion; and the AC electrical generators' inability to function after a very few seconds under zero or negative gravity conditions. *See* Plaintiffs' Liability Contentions, Doc. # 31, *passim;* Plaintiffs' Responses to Liability Discovery Requests, Doc. # 144, at 10–11, 31–36, 44.

The Detail Specification called for one manual trim to be placed on the left side of the aisle stand. Shanks Affidavit Exhibit V at 63, Exhibit W. The decision to employ one manual trim wheel rather than two (as on the DASH 80 Boeing prototype) was made by the Air Force, which ordered the second wheel removed so that a radar scope could be installed in its place, despite Boeing's suggestion that the scope be placed elsewhere. Townsend Affidavit at

---

**30.** Relying on *Deniston v. The Boeing Company,* No. 87–CV–1205, *slip op.,* 1990 WL 37621 (N.D. N.Y. March 28, 1990) (also available on LEXIS, 1990 U.S. Dist. LEXIS 3509), Plaintiffs assert that since Boeing, Lear, and MDC would have the burden of persuasion as to all elements of the *Boyle* defense at trial, they must "establish" that there is no material issue of fact with respect to each element of that defense in order to prevail on their Motions for Summary Judgment. Plaintiffs' Omnibus Reply Memorandum, Doc. # 224 at 17. This Court understands

the relative burdens of the parties to the instant motions to be otherwise. Once the moving defendants have come forward with facts demonstrating the absence of a genuine issue of fact material to each element of the *Boyle* defense, the non-moving Plaintiffs must come forward with specific facts demonstrating that such issues exist in order to defeat the instant motions. Nonetheless, as the ensuing discussion will show, Boeing, Lear, and MDC *have* met their burden even under the standard articulated by the Plaintiffs.

¶¶ 2, 4, 6; Shanks Affidavit Exhibit B at 8, 54; Shanks Affidavit Exhibit O–2. In making this decision, the Air Force took safety-of-flight considerations into account. Townsend Affidavit at ¶ 6; Shanks Affidavit Exhibit N–1. The placement of the electrical trim switches on the pilot's control wheel (also a change from the clutch-operated trim on the DASH 80) was called for in the Detail Specification, as the Air Force required. Shanks Affidavit Exhibits O–2, O–3, and V at 63. Similarly, the Detail Specification required that the trim limit switches be "placed at the extremes of the stabilizer's travel." Shanks Affidavit Exhibit V at 63.

The rate of trim movement was set according to the Air Force's order. The trim rate of the DASH 80 was felt by test pilots of the Air Force's Strategic Air Command to be too slow for the KC–135A's proposed mission; and after testing a faster rate on the DASH 80, the Air Force required it for the KC–135A. Smith Affidavit at ¶ 12; Shanks Affidavit Exhibit N–17 at 4. Plaintiffs contend that an indicator should have been located in the EC–135N pilot's line of sight to alert the pilot that the trim was moving toward a dangerous out of trim position. Doc. # 144 at 44–45. Such an indicator was not provided for in the Detail Specification, which controlled the types and placement of warning devices and indicators on the aircraft. The extant autopilot trim indicator was required by the Detail Specification to the in an overhead panel. Shanks Affidavit Exhibit V at 64, 87–88.

Plaintiffs allege that the constant speed drives (CSD) characteristic of tripping off when deprived of oil for two or three seconds was a result of defective design. Doc. # 144 at 10. This characteristic, however, was also approved by the Air Force through the Detail Specification, which called for a government-furnished CSD having an oil tank whose design limited the CSD's ability to function in negative gravity conditions. Myers Affidavit at ¶ 5 and accompanying Exhibit B. The Air Force was told of the negative gravity capabilities of the CSD and its oil tank during qualification testing of this equipment, and the Air Force accepted this equipment, as designed, for installation in the aircraft. *Id.* at ¶ 6–7. Finally, it is undisputed that the Detail Specification for the KC–135A incorporated the autopilot performance specification drawn up by Boeing. The Detail Specification for the aircraft also required the installation of the MC–1 as Government Furnished Aeronautical Equipment. Shanks Affidavit Exhibit V. As detailed above by this Court, the decision to use the MC–1 was made not by Boeing but by the Air Force, which negotiated the autopilot's Detail Specification with Lear. Utterstrom Affidavit at ¶ 6.

In approving the Detail Specification for the KC–135A and the C–135A the Air Force approved each of these allegedly defective features of the aircraft. Moreover, the Air Force's approval was given in the context of the "continuous back and forth," *Harduvel,* 878 F.2d at 1320 (quoting *Koutsoubos v. Boeing Vertol,* 755 F.2d 352, 355 (3d Cir.), *cert. denied,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985)) of the procurement and design process for the aircraft as a whole that this Court has previously described and which the Eleventh and Fourth Circuits have held satisfies the first element of the *Boyle* defense as a matter of law. To the extent that, by way of general language in their Liability Contentions, Doc. # 31 *passim,* Plaintiffs seek to implicate other, non-specified equipment on the aircraft as a "defect," the Court holds that it is sufficient that the Air Force negotiated and approved the Detail Specification for the aircraft as a whole in order that the first element of *Boyle* be satisfied. *Niemann v. McDonnell Douglas Corp.,* 721 F.Supp. 1019, 1022–23 (S.D.Ill.1989).

Although the DOD Form 250 for the accident aircraft as a C–135A is not before the Court, Boeing has come forward with Fed.R.Civ.P. 56 materials demonstrating that, with regard to Plaintiffs' design defect claims, there is no genuine issue of fact material to the second element of the *Boyle* defense. The Affidavits of Air Force personnel involved in the testing and approval process and in measuring the aircraft's compliance with the Detail Specifi-

cation demonstrate that the accident aircraft conformed with that document. *See* Smith Affidavit ¶¶ 9, 19, 21; Webb Affidavit ¶ 22. In contrast, Plaintiffs have come forward with no Fed.R.Civ.P. 56 materials that create a triable issue as to the aircraft's conformity with the Detail Specification.[31]

The core of Plaintiffs' "nonconformity" argument is their contention that Boeing, Lear, and MDC breached their duty under their contracts to produce a safe aircraft. Plaintiffs' Memorandum at 39–42. The source of this duty, according to Plaintiffs, lies in the general dictates of the Air Force's Handbook of Instructions for Aircraft Designers ("HIAD"), which is incorporated by reference into Defendants' contracts with the Air Force. Plaintiffs cite, *inter alia,* the HIAD sections requiring that "there be incorporated in each U.S. Air Force aircraft those safety measures which have been deemed essential to any other military or commercial aircraft having sim-

ilar safety requirements" and proclaiming that

> [t]he designer must recognize the importance of providing insofar as practicable, margins of stability and control sufficient to maintain flight when the aircraft had sustained damage partially destroying the flight controls or other stabilizing structure.

*Id.* at 40–41 n. 11 (quoting HIAD, Doc. # 159, Plaintiffs' Exhibit 7, §§ 0.16, 0.163). Plaintiffs assert that "[t]he existence of 'failure-modes' [identified by Plaintiffs] confirms that the defendants violated HIAD. The proof demonstrates that the failure-modes which resulted in the crash were not even identified by the defendants. This violates HIAD." *Id.* at 41. Plaintiffs further argue that the fact that the May 6, 1981 accident occurred "demonstrates that Defendants breached the 'mandatory [HIAD] standard' to 'make the aircraft safe, dependable and reliable.'" *Id.*

---

**31.** Plaintiffs argue that the EC–135N was not the Air Force's "intended configuration," because the Air Force would not have accepted the design of the aircraft or its autopilot had it known of the defects which Plaintiffs allege caused the accident herein. Plaintiffs' Memorandum at 87. In support of this contention Plaintiffs rely on statements in Colonel Webb's January Affidavit. Colonel Webb states, for example, that "the United States ... would not have accepted the Boeing Detail Specification for KC–135 airplanes if Boeing and Lear had told the Air Force that there were safety-of-flight failure modes in the constant speed drives and MC–1 autopilot." Doc. # 159, Exhibit # 6, at ¶ 14. Colonel Webb also states that "the United States would not have accepted delivery of KC–135A airplanes if Boeing and Lear had told the Air Force that there were safety-of-flight modes in the autopilot and generator constant speed drives which could cause in-flight problems and cause a crash." *Id.* at ¶ 15.

Taken alone, these statements imply both that such "failure modes" existed and that the Air Force had no knowledge of them. When read together with Colonel Webb's February Affidavit, however, the implication of lack of Air Force knowledge is dispelled. Thus, in the February Affidavit Colonel Webb states that in making the above-referenced statements he did not intend to imply that there were such "failure modes." With reference to the statement in paragraph 14 of the January Affidavit, Colonel Webb explains:

"The Air Force was well aware that the constant speed drive on the KC–135A would cease

to function, taking the alternating current generator off line, after a short period of zero or negative gravity. The Air Force did not believe that even a hard over signal from the autopilot would produce a safety of flight hazard, because an attentive pilot would overpower and then disconnect the autopilot before the aircraft entered an unrecoverable flight regime. That remains my belief today." Doc. # 227, Appendix 1, at ¶ 13.

With regard to his statement in paragraph 15 of the January Affidavit, Colonel Webb explains:

"The Air Force would not accept delivery of any aircraft if informed by competent authority, within or without the Air Force, that there were hazards associated with the aircraft that could cause a crash. My only intent in agreeing to that language in my January affidavit was to affirm that the Air Force would not knowingly accept an unsafe aircraft design. The Air Force, as always, made its own assessment of risk in light of the requirements of the military mission. I do not believe that the Air Force accepted an unacceptable hazard or that the Air Force lacked any information possessed by Boeing with respect to potential autopilot or constant speed drive hazards." Doc. # 227, Appendix 1, at ¶ 14.

Plaintiffs also allege that Boeing "intentionally mislead" [sic] the Air Force about the seriousness of "problems," presumably problems in the aircraft's flight control system and autopilot. Plaintiffs' Memorandum at 87. Plaintiffs provide no documentation for this contention, and, after thorough perusal of the extensive record herein, the Court has found none.

The problem with Plaintiffs' argument, however, is that the contractual provisions to which Plaintiffs point to demonstrate nonconformity are not the specifications that are relevant to the *Boyle* defense. As the *Kleeman* Court held, the specifications to which a military contractor's product must conform under *Boyle* are not the "general qualitative specifications" emanating from the initial stages of the procurement process, 890 F.2d at 703, such as this general language from HIAD. The specifications relevant to the *Boyle* defense, under *Kleeman*, are the "precise, quantitative specifications which [evolve] out of the continuous exchange" between the government and the contractor, *id.* at 700, i.e., the final Detail Specifications for the aircraft and its autopilot. Boeing has demonstrated that both the KC–135A and the C–135, as a series, and the accident aircraft in particular, were accepted by the Air Force, after the requisite Air Force flight testing, as conforming to their respective Detail Specifications. Smith Affidavit at ¶¶ 9, 19–21. Plaintiffs have come forward with no Fed.R.Civ.P. 56 materials to the contrary.

Boeing has also come forward with Fed.R.Civ.P. 56 materials demonstrating the requisite facts under the third element of the *Boyle* defense, which requires that a military contractor warn the Government of dangers in the use of contracted-for equipment that are known to the contractor but not to the Government. 487 U.S. at 512, 108 S.Ct. at 2518. First, as will presently be discussed, the principal defects of which Plaintiffs complain were either made known to the Air Force by Boeing and/or Lear or were independently ascertained by the Air Force. Second, Plaintiffs are entitled to every reasonable inference to be drawn in their favor from the undisputed facts of the process by which the aircraft and its autopilot were designed and manufactured (which process, it must be emphasized, Plaintiffs do not dispute); however, based upon those undisputed facts, it is *unreasonable* to infer that the Defendants would have known of any danger in the use of the aircraft and its autopilot of which the Air Force would have had no knowledge.

Thus, as a result of flight testing in 1957, and pursuant to its flight test reporting requirements under the contract, Boeing reported the problem of "trim stall," (i.e., the fact that if the horizontal stabilizer is severely mistrimmed, it cannot be retrimmed, either electrically or manually, due to aerodynamic forces on the stabilizer) to the Air Force. McPherson Affidavit and accompanying Exhibit A.[32] The Air Force elected to address "trim stall" by means of instructions in the KC–135 flight manual, rather than through an equipment change. Jacobsen Affidavit at ¶ 5 and accompanying Exhibit A.[33] Similarly, the problem of "trim runaway," i.e., uncommanded movement of the horizontal stabilizer, was known to the Air Force, which conducted its own study of the problem in 1959 and determined that "if handbook procedures are followed, adequate airplane control can be maintained in all conditions." Shanks Affidavit Exhibit O–1 at 3. On three occasions, the Air Force rejected design changes recommended by Boeing which would have decreased the likelihood of occurrence of "trim runaway." *See* Smith Affidavit at ¶ 22; Shanks Affidavit Exhibit N–6 (1965 Boeing suggestion that trim brakes be added rejected by Air Force); Smith Affidavit at ¶¶ 24–25; Shanks Affidavit Exhibits N–7 and N–8 (Boeing suggestion that trim limit switches be designed to preclude stabilizer from being electrically forced to the extremes of its potential movement rejected by the Air Force in 1964 and 1972).

As noted above, Plaintiffs have alleged that the accident aircraft's AC generator system was defectively designed due to its inability to function after a brief interval of zero or negative gravity. The record in this case shows that the Air Force ap-

---

**32.** From 1951–82, Raymond L. McPherson was a Boeing test pilot. He was Boeing's Senior test pilot on the KC–135A project from 1956–58. *Id.* at ¶¶ 4–5.

**33.** From 1954–69, Erling H. Jacobsen was the Boeing employee in charge of Boeing's participation in the development of the KC–135 and C–135 flight manuals. *Id.* at ¶ 1.

proved of the particular design configuration of which Plaintiffs complain despite several warnings of its deficiencies *from Boeing*. Boeing warned the Air Force three times in 1958 (before the accident aircraft was built)—on January 17, August and in October—that operating the aircraft in zero gravity could result in total loss of AC electrical power. Shanks Affidavit Exhibits N–11, N–13 and O–6. Boeing recommended that the Air Force use an "all-attitude" CSD oil tank to give the airplane extended zero gravity capability, Shanks Affidavit Exhibit O–5, O–6, but the Air Force rejected that proposal. Shanks Exhibit N–12. In fact, Boeing warned the Air Force, in the strongest terms, of the very combination of effects which Plaintiffs assert contributed to the accident in this case. In recommending an all-attitude tank, Boeing stated, *inter alia*, that "[l]oss of the electrical system caused by a zero-G pushover condition compounded by stabilizer out of trim condition *could result in loss of the airplane.*" Shanks Affidavit Exhibit O–6 (emphasis added). Boeing also warned the Air Force that if the aircraft experienced zero gravity conditions for more than two or three seconds all primary AC electrical power would be lost, with resulting loss of electrical trim and autopilot. Boeing told the Air Force that "the loss of electrical power during an emergency condition could compound the effects, perhaps beyond the point of recovery. This would be particularly true if [manual] stabilizer trim control were needed to recover." Shanks Affidavit Exhibit N–13.

The record before this Court also shows that the safety and reliability of the MC–1 autopilot, the component which lies at the heart of Plaintiffs' design defect claims, were suspect from the earliest stages of the KC–135 project, that the Air Force had knowledge of this fact, and that Boeing brought its safety concerns about the MC–1 to the Air Force's attention. In 1956 Boeing compiled a "history of failures" of MC–1 components and wrote the Air Force of those failures. Doc. # 159, Plaintiffs' Exhibit # 17.[34] In January of 1958, an Air Force production engineer wrote a memo to Air Force procurement personnel entitled "Sub–Standard Quality of MC–1 Autopilot Components." Doc. # 159, Plaintiffs' Exhibit # 20. The memo related that "[t]he GFAE components of the MC–1 Autopilot on the KC–135A have a dismal history of malfunctions and faulty workmanship" and warned of "the serious situation of a possible acceptance of KC–135A aircraft in such a condition as to reduce the mission effectiveness of SAC [the user of the KC–135A]." *Id.*

Plaintiffs correctly state that "in January, 1958 the Lear MC–1 was declared *unsafe*," Plaintiffs' Memorandum at 28 (emphasis in original), but Plaintiffs do *not* state that it was *Boeing* that made this judgment, *in a telex to the Air Force.* Doc. # 159, Plaintiffs' Exhibit 19. In so doing, Boeing was in accord with the judgment of Air Force quality control personnel stationed in Boeing's Renton, Washington, facility, who had discovered problems in workmanship of certain components and "decreed that the autopilot is not safe for installation until rework of GFAE components is accomplished." *Id.* The record also shows that the Air Force, through WADC and the SAC, had conducted its own flight testing of the KC–135A and had uncovered malfunctions and failures in the manual, electric and autopilot stabilizer trim systems (including "trim runaway") by May 18, 1959, when a meeting was held at WADC to discuss Air Force testing related to those problems. Shanks Affidavit Exhibit O–1 (also submitted as Lear Exhibit # 6, Doc. # 217); Hale Affidavit at ¶ 39.[35] Finally, Plaintiffs have sought, by means

---

**34.** Plaintiffs citation of this Boeing document is misleading. Plaintiffs state that Boeing's Senior Project Engineer "wrote" of the MC–1 failures, but neglect to tell the Court that he wrote the *Air Force*. Plaintiffs' Memorandum at 27.

**35.** It was at that meeting that the Air Force's Captain Bunn stated that the Air Force had determined that runaway stabilizer trim could be dealt with, and "adequate airplane control can be maintained under all conditions," if procedures in the flight manual were followed. *Id.* at 3. Thus, the Air Force made the decision not to redesign the relevant components of the aircraft.

of the January Webb Affidavit, to demonstrate that neither Boeing nor Lear told the Air Force that the autopilot was capable of causing "spontaneous uncommanded pitchover and subsequent electrical failure," Doc. # 159, Plaintiffs' Exhibit # 6, at ¶ 18. Yet Colonel Webb also testified that in so stating he had not intended to imply that the Air Force's safety analysis of the autopilot did not assume that such "hard over autopilot signals" could take place. Webb Affidavit (February 22, 1985), Doc. # 227, Appendix 1, at ¶ 17.

As the Court in *Kleeman v. McDonnell Douglas Corp.* noted, Government involvement in the design process "makes it more likely, though not certain," that the contractor will have shared information regarding potential dangers in the use of contracted-for equipment with the Government. 890 F.2d at 701. It is clear to this Court, that as to the specific dangers outlined in the preceding discussion, Boeing has come forward with Fed.R.Civ.P. 56 materials demonstrating that there is no genuine issue as to facts required by the third element of the *Boyle* defense, and Plaintiffs have come forward with no contradictory Rule 56 materials. To the extent that Plaintiffs' broadly worded Liability Contentions, Doc. # 31, and Responses to Liability Discovery Requests, Doc. # 144, implicate *other* dangers in the use of the EC–135N and its autopilot, the Fed.R. Civ.P. 56 materials before this Court similarly demonstrate no genuine issue of fact material to the third *Boyle* element. As the parties against whom the instant motions are directed, the Plaintiffs are entitled to every reasonable inference to be drawn from the undisputed facts concerning the pervasive involvement of the Air Force with Boeing in the design and testing of the aircraft. Those facts, however, make it *unreasonable* to infer that Boeing could have known of a danger of which the Air Force was unaware.

Boeing's flight testing of the aircraft was governed by its contract with the Air Force, and Air Force pilots were abroad Boeing test flights. The Air Force also conducted its own flight tests. Webb Affidavit at ¶¶ 18–19; Smith Affidavit at ¶ 11.

Under the contract, Boeing held debriefings with the Air Force after flight tests and prepared Flight Test Activities Reports summarizing all findings and performance data obtained in testing. McPherson Affidavit at ¶¶ 8–10 and accompanying Exhibit A. The Air Force had full access to Boeing test data and engineering analysis. Smith Affidavit at ¶ 26; Webb Affidavit at ¶ 23. Moreover, it must not be forgotten that the Air Force flew KC–135As for five years before the accident aircraft was built as a C–135A, and flew the accident aircraft for twenty years before the fatal accident in this case. The Air Force, therefore, had a wealth of experience with the aircraft from which to gain knowledge of any design defects independent of Defendants herein. For the foregoing reasons, the Court holds that Boeing is entitled to immunity under *Boyle* with regard to Plaintiffs' design defect claims.

### 2. Lear

■ For the following reasons, the Court holds that Lear is entitled to immunity under *Boyle* from Plaintiffs' negligence and strict liability claims based upon alleged design defects in the MC–1 autopilot. It is undisputed that, pursuant to its contract with the Air Force for the KC–135A, Boeing drafted a performance specification for that aircraft's autopilot. As noted earlier, the Air Force had considered employing a pre-existing autopilot, and Boeing had recommended the Honeywell MH–43 rather than the Lear L–10, despite the fact that those two autopilots were closely equivalent. Hale Affidavit at ¶ 10 and accompanying Exhibit C. The Air Force rejected the Boeing recommendation and elected to embark upon the development of a new autopilot system, which it ultimately designated the MC–1. Hale Affidavit at ¶ 15.

Plaintiffs assert that the MC–1 autopilot was an "off-the-shelf" product and that, therefore, *Boyle* does not immunize Defendants from claims arising from the asserted defects in the MC–1. *See, e.g.*, Plaintiffs' Memorandum at 49, 74. In support of this contention, Plaintiffs assert that "L–10 was Lear's designation for the autopilot prior to the time it became known as

the MC–1." *Id.* at 50 n. 16. Plaintiffs cite no authority for this proposition, however, and the Court has searched the record in vain for corroborative documentation. As additional support, Plaintiffs cite to language in a "representative" Lear component specification stating that "The Lear Model 1462B Trim Coupler covered by this specification is intended for use in conjunction with an automatic pilot system." Doc. # 159, Plaintiffs' Exhibit 11, at Tab 6.1. Plaintiffs also cite an excerpt from the deposition of John R. Utterstrom, the Boeing employee who oversaw the preparation of the performance specification for the autopilot, wherein Mr. Utterstrom testified that he did not think that the autopilot had been "designed uniquely" for the KC–135, that it had been designed for an F–84 fighter. Plaintiffs' Memorandum at 50 n. 17 (quoting from Utterstrom deposition, Doc. # 159, Plaintiffs' Exhibit 3).

Plaintiffs do not cite the Court to Mr. Utterstrom's statement, made in response to a question posed immediately before the question and answer which Plaintiffs do quote, that he had never examined or reviewed the detailed engineering drawings for the MC–1 components. Utterstrom deposition, Doc. # 159, Exhibit 3, at p. 110, 1. 17–21. To constitute evidence that can be considered in determining whether there exists a genuine issue of material fact herein, a statement made either in a deposition or in an affidavit must be admissible. *See* Fed.R.Civ.P. 56(e); Fed.R.Evid. 602. The two statements just discussed, when read together in context, demonstrate that Mr. Utterstrom had no first hand knowledge of the MC–1 as ultimately designed for the KC–135A. Therefore, Mr. Utterstrom's statement, relied upon by Plaintiffs, that the MC–1 shared an identity with the autopilot designed for the pre-existing F–84, cannot be considered by this Court in ruling upon the instant motions.

There is, additionally, evidence in the record tending to show that the L–10 and the MC–1 are not the same autopilot. In Boeing's letter to the Air Force recommending the MH–43, Boeing states that neither the L–10 nor the MH–43 conformed to certain aspects of the autopilot perform-

ance specification and that both Lear and Minneapolis–Honeywell had indicated that *with further development* the performance specification could be met. Hale Affidavit, Exhibit C. In this Court's view, the evidence upon which Plaintiffs' rely for their "off-the-shelf" argument does not demonstrate that there exists a triable issue as to that fact, in light of the overwhelming evidence in the record, discussed above, of Air Force involvement in all phases of the MC–1's design and development. The Court need only briefly summarize that involvement and control here.

Boeing's autopilot performance specification, together with Boeing document D–14095 (setting forth aircraft characteristics relevant to autopilot design) were part of the Air Force RFP in response to which Lear submitted its autopilot proposal. *See generally* C. Brown Affidavit. The performance specification, which had been subjected to Air Force review and revision, formed the basis of extensive negotiation between Air Force engineering personnel and Lear, negotiations that led to the detail specifications for the MC–1 components (filed as Exhibits C1–C16 to the C. Brown Affidavit). Hale Affidavit ¶¶ 16, 19, 28, 30; C. Brown Affidavit ¶ 10. The development process leading from performance specification to the ultimate design of the MC–1 components involved communication among Boeing, Lear and the Air Force. Hale Affidavit at ¶¶ 28, 30; C. Brown Affidavit at ¶ 10. *See also* Doc. # 218, Lear Appendix 6.

Air Force approval was required for any and all changes in the detail specifications. Hale Affidavit at ¶¶ 31–32. Based upon Lear's draft detail specifications for the autopilot's components, the Air Force ordered the production and testing of prototypes. *Id.* at ¶ 31. Simulator and flight testing of the prototype by Boeing and the Air Force necessitated design changes, subject always to Air Force consent. *Id.* at ¶¶ 33–34. C. Brown Affidavit at ¶¶ 12–13, 15, 17. The Air Force's monitoring of the MC–1's design and production (begun in August, 1956) to insure compliance included the stationing of Air Force personnel at

Lear's production facility. Hale Affidavit at ¶ 28; C. Brown Affidavit at ¶¶ 10–11. The Air Force ordered additional design changes in the MC–1 system following its own flight testing; some of these changes required the elimination of specific features of the prototype. Hale Affidavit at ¶ 34; C. Brown Affidavit at ¶ 17.

It is clear that the MC–1's design and development were characterized by the same level of Air Force oversight and involvement that took place in the process leading to the KC–135A's design. The detailed specifications for the MC–1's components were approved by the Air Force, which approval was signified by the Air Force's designating those components as "standard" equipment for installation in the KC–135A. Hale Affidavit at ¶ 40; C. Brown Affidavit at ¶ 17. With that designation, the component specifications were incorporated into the Detail Specification for the aircraft. *Id.* In light of the Fed.R. Civ.P. 56 materials submitted by Lear demonstrating the Air Force's ultimate control over design decisions at every stage of the MC–1's development, and given the specificity of the specifications for the autopilot components which the Air Force approved, the Court holds that Lear has met its burden under the first element of the *Boyle* defense. Plaintiffs have come forward with no Fed.R.Civ.P. 56 materials creating a genuine issue of fact material to that element of the defense.

That the Air Force had final say as to design changes in the MC–1 specifications is also relevant to the second element of the *Boyle* defense. Where, as here, there is "extensive participation" by the government in the design, testing and review process, and the government reserves the right finally to approve or disapprove modifications in design, the likelihood of "final product conformity" is enhanced. *Kleeman*, 890 F.2d at 701. Wilson E. Hale stated that individual autopilot production units were produced in conformance with the detail specification. Hale Affidavit at ¶ 40. Plaintiffs have not contended, and have produced no Fed.R.Civ.P. 56 materials indicating, that the MC–1 in the accident aircraft did not conform to the detailed

component specifications approved by the Air Force. They simply contend that the May 6, 1981, accident demonstrates that the autopilot was defectively designed and unreliable. *See, e.g.,* Plaintiffs' Memorandum at 41. The Court holds that the MC–1's conformity with the design specifications relevant to the second element of the *Boyle* defense has been demonstrated by Lear, by way of uncontradicted Fed.R. Civ.P. 56 materials.

Similarly, Lear has come forward with Fed.R.Civ.P. 56 materials, uncontradicted by Plaintiffs, demonstrating the absence of a genuine issue of fact material to the third element of the *Boyle* defense, with respect to Plaintiffs' autopilot design defect claims. That element requires that the contractor have alerted the government to dangers in the use of its equipment of which it has actual knowledge and of which the Air Force has no knowledge. *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518. This Court has previously discussed evidence in the record of the Air Force's independent knowledge of problems in the production of autopilot components, problems that called into question the autopilot's reliability, absent reworking of those components. The Air Force was also made aware, through Boeing and Lear, of deficiencies in the autopilot as a result of simulator testing of its components, and through its own flight-testing of the autopilot system. Hale Affidavit at ¶¶ 30–32. According to Wilson E. Hale, both Boeing and Lear "fully apprised" the Air Force of the results of testing that pointed to "shortcomings" in the MC–1. *Id.* at ¶ 42. As previously noted, in its own flight testing of the KC–135A, the Air Force encountered, *inter alia,* malfunctions in the autopilot stabilizer trim system. The Air Force decided to "isolate" any aircraft having such problems for correction thereof, and further decided that despite the existence of such problems, procedures in the aircraft's manual, if followed, would adequately address the general problem of runaway stabilizer trim. Doc. # 218, Lear Appendix # 6.

It is undisputed that Lear made two design suggestions which directly relate to

enhancing the safety features of the autopilot, and that the Air Force rejected those suggestions. Plaintiffs contend that the autopilot was defective, in part, because it used a vacuum tube system instead of a solid state system. Doc. # 144 at 38. In 1958, Lear recommended that the autopilot's yaw axis components be transistorized to improve the autopilot's reliability and hence the KC–135A's lateral stability when the autopilot was engaged. *See* Shanks Affidavit Exhibit N–24 (also submitted as Lear Appendix # 4, Doc. # 218). The Air Force rejected this proposal to transistorize the autopilot. Shanks Affidavit Exhibit N–26. Plaintiffs also contend that the autopilot should have been accompanied by additional warning lights and aural signals to alert the crew to autopilot malfunction. Doc. # 144 at 38. Lear's recommendation that such additional warning and monitoring systems be included was likewise rejected by the Air Force as unnecessarily complicating the autopilot's design. Doc. # 218, Lear Appendix 5; Hale Affidavit at ¶ 36.

As this Court stated in its discussion of the design process for the KC–135A aircraft as a whole, of which the testing of the autopilot was but a part, Plaintiffs are entitled to every reasonable inference to be drawn in their favor from the undisputed facts herein. Based upon the undisputed facts demonstrating the Air Force's own extensive testing and review procedures, it is *un*reasonable to infer that the Air Force could have been unaware of any danger in the autopilot that was known to Lear. There is, moreover, ample evidence in the record demonstrating both that Lear alerted the Air Force to safety-related problems in the autopilot (by way of design suggestions to enhance its safety) and that the Air Force had independent knowledge of potential dangers in the autopilot's use in the KC–135A and C–135A. To the extent that Plaintiffs contend that Lear knew or should have known of dangers in the use of the autopilot in the *EC–135N*, that contention is without merit. Lear was not consulted by the Air Force in the latter's decision to modify the C–135A for the A/RIA program. Hale Affidavit at ¶ 44; C.

Brown Affidavit at ¶ 20. Moreover, the record is clear that the Air Force had acquired millions of flight hours using the MC–1 in its 135 series aircraft, Hale Affidavit at ¶ 41, and flew the accident aircraft for years prior to the accident herein. The Air Force was therefore in a position to become aware of any limitations in the MC–1, independent of Lear, not already known to it, and this experience with the autopilot is directly relevant to the establishing of the third element of *Boyle*. *Zinck v. ITT Corporation*, 690 F.Supp. 1331, 1337–38 (S.D.N.Y.1988). For all of these reasons, the Court holds that, with respect to Plaintiffs' autopilot design defect claims, the Fed.R.Civ.P. 56 materials submitted by Lear, which are uncontradicted by Plaintiffs, demonstrate both the requisite facts and the absence of a genuine issue of material fact under the third element of *Boyle*.

### 3. MDC

■ Plaintiffs' design defects claims against MDC may be briefly summarized as follows. Plaintiffs first contend that MDC "negligently and defectively" designed, manufactured and tested its A/RIA modifications to the aircraft. Plaintiffs' Liability Contentions, Doc. # 31 at 8. Plaintiffs assert that the modifications were defective in that they failed to provide an "active" warning system to the pilot and crew that the horizontal trim was nearing a dangerous, uncommanded full nose down position. *Id.* at 9. It is also Plaintiffs' contention that the A/RIA modification which added the bulbous nose radome to the aircraft "dangerously altered the high speed flight characteristics of the aircraft," Plaintiffs' Responses to Liability Discovery Requests, Doc. # 144, at 28, and that the A/RIA modifications, writ large, "caused dangerous and excessive vibration and buffeting of the airplane during high speed flight, changed some of the aerodynamic characteristics of the aircraft relevant to recovery from a high speed dive." *Id.*

There is scant evidence in the record before this Court to support Plaintiffs' contention that the A/RIA modifications were defectively designed or that they contribut-

ed to the accident on May 6, 1981; and what evidence there is does not create a triable issue as to the existence of such asserted defects.[36] Plaintiffs' contentions that the modifications affected the aircraft's high speed flight characteristics and dangerously affected the aircraft's recoverability from a high speed dive are, precisely, nothing more than *contentions*. They are filed with this court as affirmative answers to Defendants' interrogatory asking, in part, whether Plaintiffs *claim* that the MDC's structural modifications to the C–135A were defectively designed. Doc. # 144 at 26. In further answer to the interrogatory, Plaintiffs state that the *documentary* basis of their contentions is to be found in "[a]ll of the documents produced in this case by defendants" and principally in a list of eleven documents or categories of documents, only one of which, the aircraft's flight manuals, arguably relates to the A/RIA modifications. *Id.* at 13.

With the exception of their interrogatory response (which, the Court would reemphasize, is merely a statement of Plaintiffs' *theory* of the modifications' relationship to the accident), Plaintiffs rely solely upon the deposition testimony of their expert Mark Connelly, who said

> The problem is that you [MDC] received a product [the C–135A] that had this rapid pitchover hazard built into it, and it passed through your hands, you made major modifications to it, and the product which came out was your product, and it still had this major hazard attached to it, and perhaps even worse because of your

aerodynamic changes. I can't conceive of it being better, but there is a possibility that it was somewhat better but still a hazard. I think in my mind, the problem here is that you did nothing about correcting this problem. It was still there when the product passed out of your hands.

Connelly Deposition, Doc. # 159, Exhibit 3, p. 556.[37] The record is devoid of a report by Mr. Connelly that would support this opinion, which in the Court's view is skeletal, at best. This opinion, which is Plaintiffs' sole submission under Rule 56 on the issue of a design defect in the A/RIA modifications, does not create a triable issue on this point. Nor does it create a triable issue as to whether those modifications dangerously affected the EC–135N's handling characteristics, when viewed in light of the Rule 56 materials submitted by MDC which demonstrate that MDC's flight testing of the EC–135N showed that it had handling substantially similar to those of the C–135A. Barnes Declaration at ¶ 27; Odgers Deposition, MDC Exhibit D, at 12–13.[38] General Odgers, an Air Force test pilot having 2000 hours' experience on the KC–135A and EC–135N, testified that there was "no difference" in the handling characteristics of the C–135A and the EC–135N, and that there was, therefore, no need to specially qualify C–135A pilots to fly the EC–135N. Odgers Deposition, MDC Exhibit D, at 13, 142. Finally, the Air Force's experience with the bulbous nose, which "indicated the radome introduced no adverse handling quality effects

---

**36.** As noted earlier, there is no evidence in the record to support Plaintiffs' claims, Doc. # 31 at 7–8, that any component or structural feature of the accident aircraft was negligently manufactured.

**37.** In their Omnibus Reply Memorandum, Plaintiffs cite the Court to the Connelly deposition, *as a whole,* for support for their contention that the MDC A/RIA modifications were defectively designed. Doc. # 224, ¶ 8. The Court does not bear the burden of searching that deposition, which runs to some 663 pages, for more testimony from Mr. Connelly which might flesh out the statement which Plaintiffs have chosen to stand or fall on its own as a basis for defeating MDC's Motion on Plaintiffs' design defect claims related to the A/RIA modifications. Plaintiffs

also refer the Court to the depositions of its experts Dr. Richard C. Lathrop and Robert B. Picht, again by citing those depositions *in toto.* Doc. # 224, ¶ 8. The Court declines Plaintiffs' invitation to look for their "needle in a haystack." The Court has, however, read the excerpt from the Picht deposition, Doc. # 159, Plaintiffs' Exhibit 9, and Dr. Lathrop's affidavit, Doc. # 159, Plaintiffs' Exhibit 15. Neither of these exhibits contains any discussion of the A/RIA modifications.

**38.** General Peter William Odgers was Commander, Air Force Flight Test Center, and Commander of the Air Force's 49–50th Wing (the user command for the EC–135N). MDC Exhibit D, at ¶ 7.

on the EC–135," led it to employ that modification when, in the mid–1980s, it updated its A/RIA fleet by modifying Boeing 707s. MDC Exhibit G.[39]

The Court would note that even if Plaintiffs had adduced, by way of Fed.R.Civ.P. 56 materials, facts indicative of a defect in MDC's A/RIA modifications to the C–135A, MDC would be entitled under *Boyle* to absolute immunity from suit on Plaintiffs' design defect claims. As was true in their arguments regarding Boeing's and Lear's duties under their contracts with the Air Force, Plaintiffs refer to MDC's "contractual commitment to high standards of performance" as set forth in the HIAD. Plaintiffs' Memorandum at 39. Plaintiffs also cite to portions of other documents related to the early phases of the procurement process, such as the Program Acquisition Phase Statement of Work, *id.* at 56 (citing sections 1.1, 5.2.2, and 5.2.3 of MDC Exhibit A–2, resubmitted as MDC Exhibit A–3), and the Amended Statement of Work, Project Definition Phase, for the proposition that MDC had a "primary obligation" under the contract to assure the EC–135N's "best control and stability." *Id.* at 57–58 (citing sections 1.2, 1.7 and 5–1.3 of MDC Exhibit A–4, originally submitted as MDC Exhibit A–3).[40]

Plaintiffs cite these contractual provisions in support of their contention that there is no "significant conflict," under *Boyle*, between the specifications in MDC's contract and its duty under Ohio tort law, which Plaintiffs define as a duty to "design and deliver aircraft with safe and reliable flight control and electrical systems which would allow control of the aircraft to be maintained in an emergency." Plaintiffs' Memorandum at 78. The specifications to which Plaintiffs point as sources of MDC's duty to the Air Force are not, however, the specifications which are relevant to the *Boyle* defense. *Kleeman*, 890 F.2d at 703. The relevant specifications are those contained within the Detail Specification for the modifications, as it ultimately evolved through the design and development process whose details, as previously described by this Court, are uncontroverted by Plaintiffs. The pervasive Air Force involvement in the A/RIA design and development process satisfies the first element of the *Boyle* defense as a matter of law. *Harduvel*, 878 F.2d at 1320. The A/RIA modifications were "designed through the cooperative 'back and forth' that is the 'reality of the procurement process, as well as a valuable part of that process.'" *Id.* at 1321 (quoting *Tozer v. LTV Corp.*, 792 F.2d 403, 407 (4th Cir.1986).

Although Plaintiffs assert that the MDC A/RIA modifications "did not conform to specifications," Plaintiffs' Memorandum at 86, there is simply no evidence in this record to support that claim, when the *relevant* specifications are taken into account. As this Court has previously related, at nearly every step of the design and development process the A/RIA modifications were subjected to Air Force review for conformity with the evolving Detail Specification. At the end of that lengthy process, Air Force officials signed the DOD 250 form for the accident aircraft, thereby signifying that aircraft's conformity with the requirements of the contract. Barnes Dec-

---

**39.** Although Plaintiffs contend that the EC–135N should have had an "active" warning system to alert the crew to dangerous horizontal stabilizer movement, that contention, as directed against MDC, is without merit. It is undisputed that the A/RIA modifications did not change the pilots' instrumentation panels (where such a warning system would have been located). The C–135A's cockpit configuration was not modified in the course of the A/RIA program. Allavie Deposition, MDC Exhibit E, at 63–64.

**40.** An example of the kind of language relied upon by the Plaintiffs appears in Amended Statement of Work, Project Definition Phase, Section 1.7 which, as is true of the other doc-

uments relied upon by Plaintiffs, became part of MDC's contract with the Air Force:

*Characteristics*
The A/RIA System shall be designed to meet all of the varied characteristics and performance requirements specified. The requirements of the A/RIA/ALOTS system may require aerodynamic refinements heretofore not incorporated in this type(s) of aircraft. Primary emphasis shall be placed in obtaining the best control and stability with minimum overall degradation of existing C–135 performance characteristics.
MDC Exhibit A–4, at 11.

laration at ¶ 25. Given the pervasive Air Force involvement and oversight in design and manufacture of the A/RIA-modified EC–135Ns, including substantive Air Force review of all design decisions, the signing of the DOD 250 form was not "rubber stamp" approval. *Trevino*, 865 F.2d at 1480.

Finally, with regard to the third element of the *Boyle* defense, Plaintiffs have not shown by way of Rule 56 materials *any* danger inherent in the A/RIA modifications themselves. Plaintiffs have argued that MDC knew or should have known that problems with the aircraft's autopilot, and/or trim and electrical systems "could render the aircraft uncontrollable." Doc. # 144 at 71. As the following discussion of the testing regime to which the A/RIA modifications were subjected will show, MDC's contract with the Air Force prevented the sort of testing which would have given MDC such knowledge. Moreover, this Court has previously noted the Air Force's awareness of problems with those systems, knowledge which predates MDC's involvement in the A/RIA program by many years. Plaintiffs have come forth with no Rule 56 materials creating a genuine issue of fact as to the extent of MDC's alleged actual knowledge of the defects

Plaintiffs allege caused the loss of the accident aircraft.[41] Therefore, the Court holds that MDC is entitled to absolute immunity under *Boyle* from Plaintiffs' design defect claims.[42]

### B. *Plaintiffs' Flight Testing Claims*

 Plaintiffs have alleged that Boeing, Lear and MDC were negligent in failing to flight test for the "failure modes" which Plaintiffs assert caused the May 6, 1981 accident. Doc. # 31 at 12–15. Specifically, Plaintiffs claim that Boeing, Lear and MDC were negligent in their design-related testing, in that they failed to test generally for "failure modes" and to conduct failure modes and effects analysis with regard to the automatic flight control system, the mechanical and electrical trim systems, and the electrical system. *Id.* at 14–15. Plaintiffs further allege that Boeing, Lear, and MDC were negligent in failing to test whether the aircraft was recoverable from a sudden pitch down due to uncommanded full nose down trim coupled with failure of the AC power generators, and in failing to evaluate crew response to malfunctions in the autopilot system, and to the extreme conditions which Plaintiffs assert contributed to or cause the accident, including total electrical failure due to neg-

---

**41.** Plaintiffs have, however, asserted that "[t]here is simply no evidence in this record that MDC even appreciated the magnitude of the risks in the 135/MC–1 design...." Plaintiffs' Memorandum at 38. That assertion cuts against Plaintiffs' argument that MDC cannot satisfy the third element of *Boyle*, which would require MDC to alert the Air Force to dangers of which its has actual knowledge.

**42.** In addition to arguing that it is entitled to immunity under *Boyle* from Plaintiffs' design defect claims, MDC asserts that it had no duty under Ohio law to detect and/or warn of design defects alleged to be pre-existing in the C–135As that it modified. MDC Memorandum, Doc. # 215, at 27–29. Specifically, MDC argues that as a modifier and supplier of components, it may not be held liable for "general design defects" in the aircraft as a whole. *Id.* at 28 (citing *Searls v. Doe*, 29 Ohio App.3d 309, 312, 505 N.E.2d 287, 289 (1986). MDC cites *Searls* for the proposition that a modifier/repairer is not required to secure plans for the entire system it is employed to modify and to determine if the modification will function safely in the system as a whole. *Id.*

The Court holds that *Searls* is not controlling in the instant case. *Searls* holds that manufacturers of components have no duty to warn of defects in the system, where they are not responsible for the entire system, their components are not themselves defective and are manufactured in accordance with specifications set forth by the designer/manufacturer of the system. 29 Ohio App.3d at 312, 505 N.E.2d at 290. *Searls* is distinguishable on its facts from the instant case, because the component manufacturers therein, who supplied subsystems for an assembly line, had no responsibility for the assembly line system as a whole. *Id.* at 311, 505 N.E.2d at 289. In the instant case, however, MDC had responsibility, subject to the strictures set forth in its contract, to test for the compatibility of its components and modifications with the aircraft. MDC Exhibit A–5 at 16.

MDC's testing responsibilities with respect to alleged pre-existing defects was controlled by its contract with the Air Force. As the Court's ensuing discussion will show, this fact entitles MDC to immunity under *Boyle* from Plaintiffs' flight testing claims.

ative "G" forces, sudden pitch down following autopilot disconnect, and runaway nose down trim coupled with failure of the aircraft's electrical system. *Id.* at 12–14. The record shows, however, that Boeing's and MDC's flight testing of the aircraft was tightly controlled by the Air Force, pursuant to the contracts for both the KC–135A and the C–135A. Moreover, although Plaintiffs flight testing claims are also aimed at Lear, there is nothing in the record before this Court to indicate that Lear conducted any flight testing independently of Boeing and the Air Force. In fact, the only reference to Lear's involvement in flight testing is in the affidavit of Wilson E. Hale, who states that Lear made "suggestions" as to the type of testing to be conducted, and that Lear employees were "observers" on Boeing and Air Force test flights. Hale Affidavit at ¶ 33. As the ensuing discussion will show, Boeing and MDC have come forward, by way of Fed.R.Civ.P. 56 materials uncontradicted by Plaintiffs, with facts demonstrating the Air Force's involvement in the flight testing process, which involvement is a requisite of the first element of the *Boyle* defense.

### 1. Boeing

■ Boeing argues that under its contracts with the Air Force it was not free to design its own flight test program and that the Air Force controlled the content of its flight testing. Boeing Memorandum at 72. The record in this case fully supports that argument. *See, e.g.,* McPherson Affidavit at ¶¶ 6–7; Shanks Affidavit at ¶ 27; Webb Affidavit at ¶¶ 18–19. Boeing had no authority to flight test the C/KC–135 aircraft independent of Air Force control. McPherson Affidavit at ¶ 6; Webb Affidavit at ¶ 18; Shanks Affidavit at ¶ 27. In addition to the flight testing in which Boeing was involved, the Air Force conducted its own (and far more extensive) flight testing program. Smith Affidavit at ¶ 11.

Boeing's flight testing contracts for the KC–135A incorporated military flight testing specifications. Shanks Affidavit at ¶¶ 25–26. Boeing prepared drafts of test specifications to be incorporated into its contract, subject to Air Force review and approval. *Id.* at ¶¶ 24, 30 and accompanying Exhibit P. Each flight test followed a "point-by-point" script or plan which was subject to change by the Air Force and which had to be approved by the Air Force prior to take-off. McPherson Affidavit at ¶ 7; Shanks Affidavit Exhibit N–5 (example of Air Force testing plan change). Boeing was required to submit detailed and frequent (including daily) results of its testing to the Air Force. The Air Force required only limited flight testing of the C–135A, because of its essential identity to the KC–135, and Boeing's testing responsibilities for the C–135A were limited by contract to testing flight characteristics affected by removal of the refueling boom and the C–135's different weight distribution. The results of those tests were evaluated by the Air Force for compliance with the Detail Specification and "mission requirements." Smith Affidavit at ¶ 20. As was true of the KC–135A testing program, the Air Force conducted its own extensive testing independent of Boeing. The Air Force controlled the scope of this testing, and at times rejected Boeing's proposals for further testing. *Id.* at ¶ 20; Shanks Affidavit at ¶ 30. As previously discussed by this Court, no individual C–135 aircraft could be purchased by the Air Force without the Air Force's determination, through, *inter alia,* flight testing, that it conformed to the Detail Specification. Smith Affidavit at ¶ 21.

### 2. MDC

■ Plaintiffs assert that MDC was negligent in that it breached "contractual duties," including the duty "to evaluate the compatibility of the aircraft's flight control systems with the A/RIA modifications" and the duty to "recognize, appreciate and warn about the inherent deficiencies and dangers in the 135's [including] the aircraft's flight control systems." [43] Plain-

---

**43.** Plaintiffs cite no contractual provision giving rise to the latter duty, and the Court has found none.

tiffs' Memorandum at 56–58. Finally, Plaintiffs assert that MDC violated its obligation to "identify those things which affect" the aircraft's aerodynamics, including its stability in normal and emergency flight modes. *Id.* at 58.

MDC's duties with regard to testing were tightly controlled by the Air Force, as the following facts, uncontroverted by the Plaintiffs, demonstrate. MDC's contract with the Air Force set forth the parameters of MDC's testing responsibilities. In the most general terms, the Preliminary A/RIA Engineering Specification, which was incorporated into the RFP for the A/RIA modifications, required that

> [f]light tests shall be performed on the airplane to prove all newly installed and modified systems operational, to demonstrate the structural and operational compatibility of the contractor installations with the aircraft, and to determine the effects of the installations on essential take-off and landing parameters, airspeed calibration, endurance, range, climb, and stability and control.

MDC Exhibit A–5 at 16, § 3.8. This document, which was ultimately incorporated by reference in MDC's contract with the Air Force, further required that the contractor submit all proposed flight test procedures to the Air Force 45 days prior to a scheduled test, and that no flight tests could proceed without Air Force approval. *Id.*

The contract required extensive testing of all A/RIA components, and Air Force approval was contingent upon a component's "passing" the required tests. Barnes Declaration at ¶ 18. The Contract called for three stages of testing. MDC Exhibit A–3 at 18–23. Category I testing involved a wide range of ground testing of individual components, subsystems, including engineering and laboratory tests and certain "performance," i.e., functional, and environmental testing. *Id.* at 18–19. Category I testing was conducted solely by MDC, which was required to submit all test *procedures* for pre-test approval by the Air Force. Barnes Declaration at ¶ 20. The contract also required that all test *results*

be submitted to the Air Force, which could, and did, order the retesting of items, if it found the test results unacceptable. *Id;* MDC Exhibits A–24, A–25.

Category II testing included testing of subsystems, in preparation for final aircraft systems tests, and flight testing "to demonstrate that all requirements are achieved and that the system is acceptable to the Air Force." MDC Exhibit A–3, at 21, § 5.8.1.3. This testing was accomplished by a joint "test force" comprising MDC employees, and representatives of NASA and the Air Force, under overall Air Force direction. Barnes Declaration at ¶ 21. Category II test plans were required to be drafted by MDC for Air Force approval. The Air Force could, and did, require changes in such test plans. *Id.;* MDC Exhibit A–26. The purpose of Category II testing was, in part, "to verify safety of flight, to record and evaluate aircraft performance data, and to establish the validity of aircraft aerodynamics, stability and handling characteristics, and [to] calibrate all instrumentation." MDC Exhibit A–3, at 22 § 5.8.1.3.2. The Air Force alone conducted Category III flight testing, which included implementation testing intended "to demonstrate to the Air Force that the contractor has complied with all system level performance requirements, providing the basis for final acceptance [by the Air Force]." *Id.* at 23 § 5.8.2.2; Barnes Declaration at ¶ 22. Problems identified by the Air Force during Category III testing were corrected, again subject to Air Force approval, by MDC. Barnes Declaration at ¶ 22.

The scope of MDC's testing of the EC–135N was also dictated by its contract with the Air Force. *Id.* at 23. While MDC was required to demonstrate through testing that all newly installed and modified systems were operational, MDC Exhibit A–5 at 16, and that the structural modifications to the C–135A did not significantly degrade flight and handling characteristics of the aircraft, MDC Exhibit A–3 at 3–4, it was neither authorized nor required to conduct a full battery of flight tests. Barnes Declaration at ¶ 23. Its testing, all of which was monitored by the Air Force, was limit-

ed by contract to systems affected by the A/RIA modifications. *Id.;* MDC Exhibit A–27.

Most important for purposes of the *Boyle* defense, MDC had no authority to undertake testing of, or to modify, the C–135A's autopilot or the flight control systems related to the autopilot, and in fact did not modify or test those systems. Barnes Declaration at ¶ 28; MDC Exhibit A–9 at 59–60; Barnes Deposition, MDC Exhibit C, at 29–30. The statement of Edward M. Barnes, MDC's A/RIA Program Director, that MDC had no knowledge of alleged defects pre-existing in the C–135A, Barnes Declaration at ¶ 28, is uncontradicted by Fed.R.Civ.P. 56 materials. Plaintiffs simply argue by way of memorandum that MDC "had to know" of such defects. Plaintiffs' Reply Memorandum, Doc. # 224, at 12–13. Furthermore, MDC had no authority to test for the extreme conditions related to rapid pitchover in a full nose down attitude, and so did not flight test the aircraft's handling or aerodynamic characteristics under those conditions. Barnes Declaration at ¶ 27 (MDC flight tests "did not include testing the aircraft's handling characteristics outside the acceptable performance envelope"). It is for this reason that John E. Allavie, MDC's Chief Test Pilot for the A/RIA Program, stated in his deposition that MDC did not test to evaluate pilot response to a malfunction of the autopilot system, or to electrical failure following a negative G occurrence. Allavie Deposition, Doc. # 159, Plaintiffs' Exhibit 3, at 40. Nor did MDC flight test the EC–135N's response to a full nose down trim condition. According to Allavie, there "was no need" to test of this condition. *Id.* at 33. In fact, Allavie had "never heard of a full nose-down trim condition in an airplane. . . ." *Id.*

Pursuant to its contract, and within the aircraft's normal "performance envelope," MDC evaluated the compatibility of the A/RIA modifications with the pre-existing aircraft. MDC's flight testing showed that the handling characteristics of the EC–135N were similar to those of the C–135A.

Barnes Declaration at ¶ 27. In fact, the handling characteristics of the EC–135N were so similar to those of the unmodified C–135A that the Air Force deemed it unnecessary to requalify C–135A pilots to fly the EC–135N. Odgers Deposition, MDC Exhibit D, at 12–13. Given the limitations on its authority to flight test the EC–135N, MDC could have had no actual knowledge of how the aircraft handled under, or how its crew might have reacted to, sudden pitch-over conditions caused by full nose down stabilizer trim, such as Plaintiffs' allege caused the accident herein. Under *Boyle*, a contractor has no duty to warn the government of dangers in the use of its equipment of which it has no actual knowledge. The Court holds that MDC is entitled to immunity under *Boyle* with respect to Plaintiffs' negligence-in-testing claims.

### C. *Plaintiffs' Flight Manual Claims*

■ It is important to distinguish Plaintiffs' failure to warn claims from their claims that the contractor defendants have not satisfied the third element of the *Boyle* defense. Plaintiffs' claims under *Boyle* are that the contractors had actual knowledge of the relevant "failure modes" and "failed to warn" the Air Force of those defects. Plaintiffs' failure to warn claims, in contrast, stem from alleged failures by the Defendants *to warn the Plaintiffs' decedents* of dangers in the use of the aircraft, or so the Court must assume, since it is with regard to the accident aircraft's flight manuals that Plaintiffs state their failure to warn claims. *See* Liability Contentions, Doc. # 31, at 15–16. Plaintiffs assert that the EC–135N's flight manuals were defective, in that they failed to describe the precise "failure modes," that caused the accident in this case (e.g., the uncommanded mistrim with the autopilot in the altitude hold mode), failed to warn of the consequences of sudden pitchover with trim in full nose down position, and failed to warn that the aircraft was not recoverable within seconds after pitch down with the trim in the full nose down position. Doc. # 31 at 14–17.[44] Although Plaintiffs use the ge-

---

**44.** Plaintiffs also refer to Defendants' "contract

specification warning requirements," which

neric term "Defendants" in stating their failure to warn claims, there is no evidence in the record before this Court that Lear directly participated in the production of the EC–135N's manuals. According to Wilson E. Hale, Air Force Control Systems engineer in the Automatic Flight Control Section, Air Research and Development Command, it was Boeing's responsibility to "[prepare] handbook data" on the autopilot. Hale Affidavit at ¶ 29. Plaintiffs have adduced no evidence to the contrary. Therefore, the Court considers Plaintiffs' failure to warn claims as stated against Boeing and MDC.

Plaintiffs principally rely upon *In re Joint Eastern and Southern District New York Asbestos Litigation*, 897 F.2d 626 (2d Cir.1989), in which the Court held that the manufacturer of asbestos-containing cement procured by the Navy for ship building and repair was not entitled to immunity under *Boyle* from Plaintiffs' failure to warn claims resulting from their exposure to that cement at the Brooklyn Navy Yard in the 1940's. Plaintiffs argued that nothing in the Navy specifications for the packaging and labeling of the cement precluded a warning as to the dangers of asbestos exposure, and the district court agreed, denying the manufacturer's motion for summary judgment on grounds that there was no "significant conflict" under *Boyle* between the manufacturer's labelling duty under the contract and its duty to warn under state law. 897 F.2d at 628. The Second Circuit affirmed, stating that there was no indication in the record "that the Government controlled or limited the ability of contractors like [Defendant] themselves to warn those who would come into contact with [their] product." *Id.* at 632.

Plaintiffs rely on *Asbestos Litigation* for the proposition that if there is no conflict between the warning requirements in a military contractor's contract and the contractor's duty to warn under state law, *Boyle* requires that state law governing failure to

warn claims must be applied. Plaintiffs' Memorandum at 79. *Asbestos Litigation* is not the only case to so interpret *Boyle* in a failure to warn case involving asbestos-containing cement manufactured pursuant to government contract. *See, e.g., Dorse v. Eagle–Picher Industries, Inc.*, 898 F.2d 1487 (11th Cir.1990) (three-part test of *Boyle* need not be reached in failure to warn case where no conflict exists between state law duty to warn and labeling duty under contract). This Court is not convinced, however, that the Second Circuit and Eleventh Circuits are correct in treating the "significant conflict" requirement of *Boyle* as a factual element of the defense. In this Court's view, the requisite "significant conflict" under *Boyle* is present when state law would impose liability where the three *Boyle* elements are satisfied. Even if, however, the Second and Eleventh Circuits' view of *Boyle* is accepted, the *Asbestos Litigation* and *Dorse* cases are distinguishable on their facts from those at issue in the instant case. Whereas in those cases the government contractors were not prevented by their contracts from providing the warnings that Plaintiffs therein argued were called for by state law, Defendants in the instant case had no leeway where the content of the accident aircraft's manuals was concerned, as the following uncontroverted facts demonstrate.

The flight manuals for the KC–135 and C–135 were published by the Air Force as "technical orders." Lee Affidavit at ¶ 2.[45] In 1956, Boeing drafted a preliminary KC–135A flight manual, based largely on engineering data, before flight testing of the aircraft. *Id.* at ¶ 3. This preliminary draft was written to conform to military format specifications. *Id.* After flight testing, the Air Force ordered hundreds of changes in the manual before approving it for final publication. *Id.* The KC–135 manual was the product of yearly Command Review

Plaintiffs assert do not conflict with any state law duty to warn. Plaintiffs' Memorandum at 79. Plaintiffs do not, however, cite the Court to such requirements in the contracts, nor do they provide any clue in the text of their submissions

to this Court as to the content of such "requirements."

**45.** Harry S. Lee was Boeing's Flight Publication Supervisor.

Conferences, with Boeing personnel and Air Force engineers and representatives of the SAC (the use command). Jacobsen Affidavit at ¶ 2. Disputes between Boeing and the Air Force as to the content of the manuals were always resolved in favor of the Air Force's view. *Id.* at ¶ 4. As Erling H. Jacobsen, the Boeing employee responsible for Boeing's role in the development of the KC–135 series manual from 1954–1969 stated, "Boeing's task was to assist the Air Force in producing manuals that say what the Air Force want[ed] them to say." *Id.* at ¶ 2. From the time of its initial release in September, 1956 the KC–135A flight manual was revised and reissued by the Air Force several times a year. Lee Affidavit at ¶ 4.

Pursuant to its 1961 contract with the Air Force to manufacture the C–135A, Boeing prepared a draft of the C–135A flight manual. *Id.* at 5. The contract required that the KC–135A flight manual be used as the basis of the C–135A manual, with changes commensurate with its new usage as requested by the using command (Military Airlift Command or MAC). *Id.* at ¶ 7. After review of the preliminary C–135A manual draft, the Air Force initiated hundreds of changes before publishing it in September, 1961. This, manual, like that for the KC–135A, was subjected to Command Review Conferences at which the Air Force made decisions concerning the manual's content, based upon user command review and Boeing's technical advice regarding the manual. *Id.* at ¶ 8. The C–135A flight manual in effect on May 6, 1981, had undergone 54 changes since a complete reissue by the Air Force in 1964, all of which changes were "directed by the Air Force, with the Air Force maintaining *complete control* over content." *Id.* at ¶ 9 (emphasis added).

A similar process was involved in the drafting and publication of the EC–135N manual. MDC's contract with the Air Force required it to make revisions in the C–135A manual relevant to aspects of the aircraft modified under the A/RIA program. Barnes Declaration at ¶ 24; MDC Exhibit A–9 at 108. As was typical of Air Force practice, prepublication reviews of all

the supplemental manuals were conducted to insure compliance with "technical direction" given MDC by the Air Force. Barnes Declaration at ¶ 24. The exchange of information between the Air Force and MDC concerning the supplemental manuals is amply demonstrated by the correspondence in MDC Exhibit A–28. As Edward M. Barnes, MDC's A/RIA Program Director stated, "MDC could not put *anything* into the manual without the express approval of the Air Force." Barnes Declaration at ¶ 24 (emphasis added).

It is clear to this Court that the Air Force tightly controlled the content of the flight manuals in effect on May 6, 1981. Plaintiffs do not allege that the manuals did not conform to Air Force specifications; they simply allege that the manuals were "defective" because they lacked certain warnings. Doc. # 31 at 15–16. The Court finds persuasive the reasoning in *Nicholson v. United Technologies Corp.*, 697 F.Supp. 598 (D.Conn.1988), a case involving failure to warn claims based upon asserted omissions in the manual accompanying an army helicopter. In *Nicholson*, Plaintiff, a federal civil service mechanic, was injured while repairing an Army CH–54B helicopter's landing gear. *Id.* at 599. Plaintiff argued, *inter alia*, that the failure of United Technologies Corp (UTC) to include adequate warnings and instructions regarding the repair and disassembly of the landing gear in the CH–54B maintenance manual was a proximate cause of his injury. *Id.* at 603. In holding that the *Boyle* defense barred Plaintiff's failure to warn claim, the *Nicholson* Court noted that

> UTC undertook no action with respect to the CH–54B manuals other than that under contract with the government and in conformity with government specifications.... The government maintained control over the contents of the manual and made revisions to the contents without the consultation or knowledge of UTC.... Further, in connection with revisions made pursuant to government contract, government personnel, including users of the manual, contributed the majority of expertise into the proposed

changes to the manual.... The Specifications [under which UTC acted in revising the manual] outline the requested changes to the manual and then identify each specific page requiring change.... The specifications also refer to government furnished data which is used in developing the manuals. Lastly, such revisions were subject to government review and approval.

*Id.* at 604. These uncontroverted facts, the Court held, satisfied the first two elements of the *Boyle* defense. *Id.* at 604–05. The Court also held that since UTC had come forward with evidence that it had no knowledge of the asserted defects in the landing gear when it drafted the manual, and since Plaintiff had come forward with no evidence to the contrary, the third *Boyle* element was also satisfied. *Id.* at 605.

In the instant case, as the uncontradicted Fed.R.Civ.P. 56 materials submitted by Boeing and MDC show, there is no material difference between the Air Force's involvement and control in the process surrounding the production of the accident aircraft's manuals and the Army's involvement in *Nicholson.* The first and second elements of the *Boyle* defense, as it relates to the EC–135N's manuals, are therefore satisfied herein. Boeing and MDC have demonstrated that they could not, absent Air Force approval, have added a warning such as those Plaintiffs allege were required. Plaintiffs herein have come forward with no evidence creating a triable issue as to the Air Force's complete control over the manuals' content. Furthermore, Plaintiffs have come forward with no Fed.R.Civ.P. 56 materials demonstrating that Boeing and MDC had actual knowledge of a danger of which the Air Force was unaware and which should have been referred to in the manuals. Therefore, the Court holds that Boeing and MDC are entitled to immunity under *Boyle* from Plaintiffs' failure to warn claims.

### D. *Plaintiffs' "Fleet Support" and Maintenance Contracts Claims*

Plaintiffs assert that Boeing breached its Fleet Support Contracts with the Air Force, contracts which, Plaintiffs claim, required Boeing to "review *failure data* concerning the 135's reliability." Plaintiffs' Memorandum at 60–61 (emphasis in original). This claim, *qua* contract claim, makes its first appearance in this litigation through Plaintiffs' Memorandum. It is not to be found in any complaint filed herein, nor has the Court located it in Plaintiffs' Responses to Liability Discovery Requests (Doc. # 144). Similarly, no breach of Fleet Support Contract claim, *qua* contract claim, appears in Plaintiffs' Liability Contentions, Doc. # 31, filed pursuant to this Court's order. Doc. # 27.

Plaintiffs' Liability Contentions do state, however, that "[i]n general terms ... Boeing, Lear and MDC ... carelessly and negligently monitored, advised, serviced and consulted in the maintenance and repair of [the 135 series aircraft and its subsystems]." Doc. # 31 at 7–8. Additionally, Plaintiffs' Liability Contentions state that by virtue of their "ongoing service agreements" with the Air Force, Boeing, Lear and MDC had a "continuing obligation to monitor the maintenance and repair of the subject airplane...." *Id.* at 19. Plaintiffs have apparently abandoned their claims against Lear and MDC based on "ongoing service agreements," as there is no mention of such claims by Plaintiffs in either their "Omnibus" Memorandum Contra the Defendants' Motions for Summary Judgment, Doc. # 219, or in their "Omnibus" Reply, Doc. # 224. In fact, there is no evidence in the record before this Court that Lear had such a contract with the Air Force. Moreover, MDC has established, by way of Rule 56 materials, that once it accepted delivery of the accident aircraft "the *Air Force* ... operated, maintained and repaired the aircraft with no assistance from MDC." Barnes Declaration at ¶ 26 (emphasis added). Plaintiffs have come forward with no facts creating a triable issue on this point.

Furthermore, the Plaintiffs strenuously argue that "[n]o maintenance deficiency caused or contributed to this tragedy," and that "[w]hen [the accident aircraft] departed Wright–Patterson Air Force Base on May 6, 1981 the aircraft was praised as an

exceptionally well maintained aircraft." Doc. # 219 at 24 (citing testimony of Air Force personnel). Therefore, as Plaintiffs' own evidence indicates, even if the record before this Court showed that "ongoing service agreements" requiring Lear and MDC to "monitor the maintenance and repair of the subject airplane" existed, Plaintiffs' own submissions to this Court demonstrate no breach of that obligation, with respect to the accident aircraft, by those Defendants.

■ The Court next turns to the question whether the evidence submitted by Plaintiffs in support of their Fleet Support contract claim against Boeing is potentially supportive of their negligence claims against Boeing. Plaintiffs cite the Court to language in Contract No. F34601–81–C–0108, obligating Boeing to "[p]rovide engineering services to maximize the reliability and operational effectiveness of the C/KC–135 weapon system and to integrate changes/modifications thereto in an orderly and timely manner." Plaintiffs' Exhibit 13 at 1.[46] The contract was executed in December of 1980. Plaintiffs do not expressly explain how the contractual provisions they cite were breached or how the cited language relates to a duty to review "failure data."

Plaintiffs do, however, quote from the deposition testimony of Harry Mankins, Boeing's Chief of Fleet Support Contracts, to the effect that the Fleet Support contracts required Boeing to *store* "reliability information," or "66–1 data," sent to it by the Air Force and that Boeing *stored,* but did not *evaluate* maintenance information about the C–135 and its components (including the autopilot) received from the Air Force. Plaintiffs' Memorandum at 62–63 (quoting excerpts from Mankins Deposition, Doc. # 159, Exhibit 3) (emphasis added). Plaintiffs quote the following colloquy from the deposition:

Q. After you receive maintenance information on the components and systems of the 135 series airplane, including the components of the autopilot, do you evaluate that information on a periodic basis?
A. No.
Q. What do you do with that information, do you just store it?
A. We just store it, until it is needed.

Exhibit 3, Mankins Deposition at p. 57, lines 14–24. Plaintiffs then proceed to quote a question concerning the length of time for which Boeing received maintenance information, which appears at page 61, lines 16–21 of the deposition. Plaintiffs' Memorandum at 63. Plaintiffs do not quote (and fail to indicate the omission by means of ellipsis) the colloquy immediately preceding that question, at page 61, lines 4–6:

Q. So, if the Air Force does not direct you to do anything, you just receive that information and hold it; is that correct?
A. That is true.

Doc. # 159, Plaintiffs' Exhibit 3, Mankins Deposition at p. 61, l. 4–6.

The Court points to this language in the deposition for two reasons. First, to the extent that Plaintiffs' are arguing that Boeing breached a duty (having origins in the Fleet Support Contract) to evaluate "failure data" about the autopilot, the question and answer cited by this Court (and omitted by Plaintiffs in their Memorandum) give rise to the inference that Boeing was *not* so required, absent Air Force authorization. At the very least, it suggests Mankins' statement that Boeing had not evaluated such data is not indicative of negligence on Boeing's part.

Second, this language, together with Mankins' statements that Boeing received the information referred to *from the Air Force,* is relevant to the third prong of the *Boyle* defense. In essence, Plaintiffs' would appear to be arguing that Boeing breached its duty to evaluate data known to the Air Force concerning reliability problems with the autopilot. Thus, the deposition testimony cited does not give rise to an

---

**46.** Page one of Plaintiffs' Exhibit 13 is illegible. At footnote 23 to their Memorandum, Plaintiffs also cite the Court to Sections of a document which Plaintiffs have neglected to cite either by name or by document number. The Court has located the cited language, however, imbedded within an attachment to Plaintiffs' Exhibit 13, Attachment I, revised March 15, 1980, at p. 4.

inference that, as far as this data is concerned, Boeing withheld information, *unknown to the Air Force*, concerning safety-related defects. *See* Boeing's Reply, Doc. # 226, at 35.

## V. CONCLUSION

As the uncontroverted facts before this Court establish, the Air Force's involvement in the design and development processes for the KC–135A, C–135A, the MC–1 autopilot, and the A/RIA modifications resulting in the accident aircraft's EC–135N configuration was both far-reaching and authoritative. Air Force engineers had decisive input into the design process culminating in the Detail Specifications for the Boeing-manufactured KC–135A and C–135A aircraft. These Detail Specifications, themselves the product of negotiations between the Air Force and Boeing, incorporated the specifications for the MC–1 autopilot, as negotiated between the Air Force and Lear. The design of the A/RIA modifications was likewise a joint effort of the Air Force and MDC. With respect to all three moving Defendants, the Air Force exercised final authority over the design it ultimately approved and over modifications in that design.

The Air Force's control over the scope and design of the testing programs associated with the design effort for each Defendant's equipment was equally pervasive, as was Air Force control of the content of the manuals in effect on the day the accident aircraft was lost. The process leading to final Air Force acceptance of the accident aircraft in its C–135A and EC–135N configurations, as set forth in uncontradicted Fed.R.Civ.P. 56 materials, satisfies the first element of the *Boyle* defense as a matter of law. *Harduvel,* 878 F.2d at 1320. Indeed, the pervasiveness of Air Force oversight and control of the design efforts described herein far exceeds the literal requirement of *Boyle* that the government, and not solely the contractor, merely have *considered* the design features at issue in this case. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518.

Defendants have also demonstrated, again by way of Fed.R.Civ.P. 56 materials that are uncontradicted by Plaintiffs, the absence of a genuine issue of fact material to the second element of the *Boyle* defense, with respect to all of Plaintiffs' claims. Plaintiffs have come forward with no evidence whatsoever that the accident aircraft, or its autopilot, failed to conform to their respective Detail Specifications. Plaintiffs have strenuously argued that the accident aircraft did not conform to the general hortatory language of requirements in the moving Defendants' contracts calling for the delivery of a safe, reliable aircraft. It is, however, the Detail Specifications, as ultimately evolved through the give and take between the Air Force and its contractors, to which Defendants' equipment must conform under *Boyle. Kleeman,* 890 F.2d at 702. Plaintiffs argue that the May 6, 1981, accident itself demonstrates that the aircraft and its autopilot were unsafe and, therefore, not in conformity with the moving Defendants' contract specifications. In the absence of Fed.R.Civ.P. 56 materials showing that the accident aircraft and its autopilot failed to conform to the *relevant* specifications, however, that argument amounts to no more than the assertion that the aircraft's "intended configuration" produced, in this case, "unintended and unwanted results." *Harduvel,* 878 F.2d at 1317. Where equipment manufactured in conformity with a government-directed design produces such results, causation having been assumed herein for the purposes of the instant motions for summary judgement, there exists no genuine issue of fact material to the second element of the *Boyle* defense.

The Court also holds that all three moving Defendants have demonstrated, by way of Fed.R.Civ.P. 56 materials that are uncontradicted by Plaintiffs, that there exists no triable issue of fact material to the third element of the *Boyle* defense, as same applies to all of Plaintiffs' claims. As the record shows, Boeing repeatedly warned the Air Force of safety-related problems in the KC–135A's AC generator system, warned of the potential compounding effects on safety of total loss of electric

power, a mistrimmed stabilizer and zero-gravity conditions (such as are encountered in a sudden pitch over into full nose down position), and made design suggestions (rejected by the Air Force) to decrease the likelihood of a runaway trim condition. In 1958, Boeing also warned the Air Force of problems in the production of the MC–1 which, in Boeing's view, rendered it unsafe and required reworking of various components. Similarly, Lear made design recommendations which would have enhanced the autopilot's safety and reliability, but the Air Force rejected same. Deficiencies in various autopilot components were also made known to the Air Force through Boeing and Lear's simulator tests.

The Defendants' uncontradicted Fed.R. Civ.P. 56 materials also show that as early as 1959 the Air Force had independently encountered the problem of runaway trim, and had experienced failures and malfunctions in the manual, electrical and autopilot trim systems, the very systems implicated by Plaintiffs as playing a crucial role in the May 6, 1981 accident. This knowledge pre-dated MDC's contract for the A/RIA modifications by several years. There is no evidence in the record herein demonstrating a danger in those modifications, nor is there evidence, by way of Fed.R.Civ.P. 56 materials, that MDC had actual knowledge of the dangers which Plaintiffs allege were inherent in the C–135As, including the accident aircraft, which MDC contracted to modify.

Relying upon the uncontradicted Fed.R. Civ.P. 56 materials submitted by Boeing, Lear, and MDC, this Court has described in exhaustive detail the procurement and design processes that led to the accident aircraft's configuration as an EC–135N. The Plaintiffs, as the parties against whom the instant motions are directed, are entitled to every reasonable inference in their favor to be drawn from those undiputed facts. On the basis of those facts, however, it is unreasonable to infer that the Air Force would not have known of a danger in the use of the accident aircraft that was known to the Defendant contractors herein. Certainly, the Plaintiffs have come forward with no facts to indicate that any Defendant withheld such knowledge. Moreover, the undisputed facts document the Air Force's own independent experience with KC–135As, C–135As, and EC–135Ns in general, and with the accident aircraft in particular. On the basis of those facts, it is likewise unreasonable to infer that the Defendants could know of a danger of which the Air Force was unaware by the time the tragic accident in this case took place.

The instant case is, in this Court's view, precisely the kind of case to which the government contractor defense was intended to apply. The KC–135 and its autopilot were procured for the purpose of serving the needs of a major component of the government's defense strategy, the B–52 bomber. The C–135A and the EC–135N were likewise developed to serve the government's highly complex military and scientific needs. Trade-offs between the required military mission's effectiveness, its cost, and safety concerns are a necessary part of the government's procurement and design activities in projects such as these. It is this sort of balancing which the *Boyle* defense protects, by providing for contractor immunity where state tort law would hold contractors liable for injuries resulting from the government's design decisions. As Former Justice Powell stated in *Harduvel*, "[a]lthough the defense may sometimes seem harsh in its operation, it is a necessary consequence of the incompatibility of modern products liability law and the exigencies of national defense." 878 F.2d at 1322. That rationale is, of course, controlling of the legal issues in this case. It cannot, however, be comforting to the Plaintiffs in this case, whose grievous loss is felt not only by this Court, but surely by all those who value the men and women who devote, and often sacrifice, their lives to the service of this country.

For the foregoing reasons, this Court holds that the government contractor defense set forth in *Boyle v. United Technologies Corportion*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), applies to all of the Plaintiffs' claims herein, and that the

moving Defendants have demonstrated, by way of uncontradicted Fed.R.Civ.P. 56 materials, that there exists no genuine issue of fact material to any element of that defense. Therefore, the Court finds well taken, and sustains in their entirety, Boeing's, MDC's and Lear's Motions for Summary Judgment (Doc. #s 150, 215, 217, respectively).

This Court orders the Office of the Clerk of Courts to enter judgment in favor of the moving Defendants and against the Plaintiffs in the consolidated case (C–3–82–195) and in the above captioned 15 cases which have been consolidated therein. Following the entering of judgment as aforesaid, cases C–3–82–204, C–3–82–211 and C–3–82–366 are to be severed from the other 13 cases in which judgment has been entered. Judgment in those 13 cases is to be final, the three Defendants in whose favor summary judgment is granted being the only three Defendants in those cases. The three cases to be severed represent suits on behalf of civilian Plaintiffs against not only the three moving Defendants herein but against the United States of America as well. Those three to be severed cases will remain consolidated with each other, following the severance. Trial upon the merits of the three severed cases will be had during the week of February 19, 1991, before the Court sitting as the trier of fact. In this fashion, since final judgment will have been entered in favor of all Defendants and against Plaintiffs, in the 13 cases in which the Government is not a party, an immediate appeal can be taken on those cases.

There will be no Fed.R.Civ.P. 54(b) certification (no just reason for delay) on the three severed cases. Although an argument could be made that an interlocutory appeal by the Plaintiffs on those severed cases would, nonetheless, permit jurisdiction to remain in this Court for purposes of the Plaintiffs' trial against the Government, it is also true that any decision by the appellate court on the thirteen cases in which the Government is not a party (and in which final judgment is being entered by separate entry) will act as a collateral estoppel in the three severed cases as well.

APPENDIX A

For certain background regarding *alleged* inconsistencies among the three Webb affidavits in the record in this case, the Court sets forth the following:

In his February Affidavit (Doc. # 227, Appendix 1) [obtained by Boeing], Colonel Webb states:

¶ 16 In stating in my January affidavit [Doc. # 159, Exhibit 6] (¶ 16) that "Boeing ... never told the Air Force that several seconds after a full nose down trim pitch-over and electrical failure KC–135A airplanes are not recoverable," I carefully added the phrase "to the best of my knowledge." I have now refreshed my memory with a document in which Boeing substantially makes the point in question:

> Loss of the electrical system caused by a zero-G push-over condition compounded with stabilizer out of trim condition could result in loss of the airplane.

(Agenda Item for Weapons System Phasing Group Meeting of August 12–13, 1958, attached as Exhibit A hereto). Mr. Rosenberg did not inform me of the existence of this document in asking me to affirm this paragraph of my January affidavit. After reviewing this document I now recall this Boeing warning. I still do not recall any occasion on which a Boeing representative said in so many words that "several seconds after a full nose down trim pitch-over" the aircraft would become unrecoverable. Indeed, that is almost too obvious to require saying. Any pilot would know that several seconds after a full nose down trim pitch-over the aircraft would exceed its "placard speed"—its fastest permissible operating speed. Like any other Air Force pilot I would not have assumed that I could recover after exceeding the placard speed of the aircraft in a dive.

¶ 18. In my January affidavit (¶ 19) I stated that "Boeing to the best of my knowledge ... never told the Air Force that the manual trim system in the KC–

135A airplanes is insufficient as an emergency back-up trim system to recover the airplane from a full nose down trim pitch-over and subsequent electrical failure." When Mr. Rosenberg asked me to affirm this statement he did not bring to my attention the following language from a 1958 letter from Boeing to the Air Force through Boeing's representative in Dayton (attached hereto as Exhibit B):

> The loss of electrical power during an emergency condition could compound the effects, perhaps beyond the point of recovery. This would be particularly true if stabilizer trim control were needed to recover.

As I interpret these words, Boeing was warning the Air Force that the manual trim system might not always be sufficient to recover in an emergency accompanied by an electrical failure. I believe, however, that the Air Force was already aware of this fact. We knew of the slow speed of the manual trim wheel and of the phenomenon of "stabilizer stall." When a pilot is holding the control column with significant force because of a mistrimmed stabilizer, the air load on the stabilizer will make it impossible for the stabilizer to be retrimmed....

¶ 20. I am not a partisan in these legal actions. I have not accepted, asked for or been offered remuneration by any party to these actions. I have attempted to be open and cooperative with opposing parties. That is why I felt it was appropriate for me to give an affidavit to plaintiffs as well as to Boeing. I objected to certain of the statements in my January affidavit because they are potentially misleading. In particular, I objected that certain of the items as to which I recalled no Boeing warning in fact required no warning. They were obvious to the Air Force; they were certainly obvious to me. Mr. Rosenberg urged me not to cross out any statement from his draft that I thought was literally true to the best of my knowledge at the time.

¶ 21. I showed Mr. Rosenberg my affidavit of July 1984 and indicated to him that I was not retracting anything that I stated in that affidavit. Nothing in my affidavit of January 1985, as I understand and intended it, contradicts anything in my earlier affidavit....

## APPENDIX B

The decision on these pending motions for summary judgment has been unconscionably delayed. While not intending to shift the blame for the delay, this Court's efforts have been hampered by what it feels are egregious deficiencies in the Plaintiffs' submissions on the pending motions. These deficiencies, many of which require the Court to literally "search for a needle in a haystack," either because of citation to an incorrect document number, citation to statements whose import the Court cannot readily discern or as the result of the Plaintiffs' blithe references to the entirety of mega-hundred page documents, with no more specific cite given, as documents allegedly creating a genuine issue of material fact, have increased the workload of this Court in well-nigh exponential fashion in dealing with these motions. Several such deficiencies have been referred to in the text of the Court's opinion; a smattering of others follows:

1. Plaintiffs allege that MDC's "failure to test and evaluate the consequences of full nose-down trim ... violates § 3.1.3.7 of the A/RIA specification [MDC Exhibit A–1, previously submitted]." Plaintiffs' Memorandum, Doc. # 219, at 65. In response to this Court's order, Doc. # 213, that the parties resubmit their motions for summary judgment and memoranda, MDC submitted a set of renumbered exhibits. Plaintiffs' Memorandum does not take account of this renumbering. Old MDC Exhibit A–1 was resubmitted as MDC Exhibit A–2.

The language quoted by Plaintiffs as located in Section 3.1.3.7, Plaintiffs' Memorandum at 65 n. 24, does not appear in Section 3.1.3.7 of MDC Exhibit A–2 (formerly MDC Exhibit A–1). The Court has searched Exhibit A–2 in vain for the language quoted by Plaintiffs, as well as for a

comparable "Section 3.1.3.7" in other exhibits.

2. Plaintiffs allege that "[t]he following sections of specification number CP100001A also were violated [by MDC]," and enumerates several provisions of a general nature, much like the sections of the HIAD they rely upon elsewhere. Plaintiffs' Memorandum at 66–68. Plaintiffs do not cite the Court to an Exhibit number, nor do they allege any facts indicating how "specification number CP100001A" was violated, which facts might have given the Court a clue as to the location of the cited language. Once again, the Court has searched the *entire* record in this case in vain for a document, or section thereof, with this title.

3. Plaintiffs allege that the MC–1 autopilot's "lack of 'reliability' was a breach of contract" and cite the Court to certain numbered sections of an unnamed document without providing an Exhibit number. Plaintiffs' Memorandum at 60 and 60 n. 21. This, too, sent the Court upon the proverbial search for a needle in a haystack, a needle which the Court has been unable to find.